WILLIS and Wife *v.* MILLER, Treasurer, etc., and others.[1]

*(Circuit Court, E. D. Virginia.* October, 1886.)

1. CONSTITUTIONAL LAW—OBLIGATION OF CONTRACTS—VIRGINIA COUPONS—VIR-GINIA ACT OF MARCH 30, 1871, AND OF MARCH 15, 1884—SCHOOL TAX.

The act of the Virginia legislature of March 30, 1871, commonly called the "Funding Act," providing that the coupons on bonds issued under that act should be receivable for *all* public taxes and dues, is not invalidated or ren-dered unconstitutional by the fact that the legislature subsequently, by the act of March 15, 1884, altered the method of collecting the school tax and the mode of its distribution, and segregated that tax from the gross tax collected.[2]

2. SAME—VIRGINIA ACT OF MARCH 15, 1884.

So far as the act of the Virginia legislature of March 15, 1884, forbids the re-ceipt of tax-receivable coupons for any state tax, it is an act impairing the ob-ligation of contracts, and is void under the constitution of the United States.

3. TAXATION — VIRGINIA TAX-RECEIVABLE COUPONS— RIGHT OF TAX-PAYER TO STAND ON TENDER of COUPONS— VIRGINIA ACTS OF JANUARY 14, 1882, AND MARCH 15, 1884.

A tax-payer in Virginia is under no obligation to pay state taxes in money, and to surrender his tax-receivable coupons for identification and verifica-tion, as provided by the act of January 14, 1882. He has a right to stand upon the tender of the coupons.

4. TRESPASS — TAX COLLECTOR A TRESPASSER — TAX-RECEIVABLE COUPONS — MEASURE OF DAMAGES.

Upon the tender of tax-receivable coupons by a tax-payer of Virginia for the payment of taxes due the state, whether the coupons are received or not, the taxes are paid, and any levy by a county treasurer upon the property of the tax-payer after such tender is a trespass; and in an action for damages for such levy, where, at the time it was made, the officer knew that it was illegal, punitive damages may be recovered.

5. SAME — JOINT TRESPASSERS — STATE OFFICERS ADVISING ILLEGAL TAX LEVY —VIRGINIA ACT FEBRUARY 24, 1886.

The members of the Virginia "indemnity board," created by the act of Feb-ruary 24, 1886, are jointly liable with a county treasurer for a trespass com-mitted by him in making a levy for non-payment of a state tax after tender by the tax-payer of tax-receivable coupons, where they advised such levy, and promised legal assistance and indemnity in the case of the treasurer being mulcted in damages.

6. DAMAGES—ILLEGAL LEVY OF TAX—MALICE.

Malice in law is not necessarily personal hate or ill will of the trespasser towards the person injured, but it is that state of mind which is reckless of law and of the legal rights of the citizen; and the object of exemplary dam-ages or "smart money" is not only to indemnify the sufferer for any loss sustained, but to prevent similar actions on the part of the trespasser in the future.

At Law. Trespass.

Prior to the late civil war the state of Virginia borrowed large sums of money upon her bonds bearing 6 per cent. interest to con-struct works of internal improvement, such as railways, and so forth. Her bonds being in the main held outside of her own borders,—in the north and in England,—she paid no interest on them during the war and during the period of reconstruction. During the war, one-

---

[1] See Strickler v. Yager, *post,* 244.

[2] As to legislation impairing the obligation of contracts, see Saginaw Gas-light Co. v. City of Saginaw, 28 Fed. Rep. 529, and note; City of Louisville v. Weible, (Ky.) 1 S. W. Rep. 605, and note.

third of her territory and population were detached, and erected into the state of West Virginia. *Virginia* v. *West Virginia*, 11 Wall. 39. In 1871 public attention had come to be attracted to the condition of Virginia's debt, and a general demand arose that some provision should be made to meet it. The people of the state of Virginia took this view of the matter: They said that as West Virginia had taken part in borrowing this money, and received her share of the benefit of it, it was but fair that she should bear her share of the burden of it, and, as that part of the state which had been detached was about one-third in respect to territory and population, it was assumed that her share of the debt, therefore, was one-third.

Accordingly, the state of Virginia, on March 30, 1871, passed an act which offered to all holders of her old bonds that, if they would surrender them to her, she would give them her new bonds for two-thirds of the principal, and two-thirds of the interest overdue on the old bonds, and on this new bond she would pay them 6 per cent. interest, and also give them a certificate, with respect to the remaining third, that as to it she would turn over to them whatever she might thereafter obtain from West Virginia on account of it. She proposed, further, that the new bonds should run 34 years, with interest payable semi-annually, and that the interest promises should be represented by coupons, which should be receivable in payment of all taxes, debts, and demands due the state.

This proposition proved acceptable to the creditors, and they at once began to fund freely. When new bonds to the amount of $22,000,000 had been issued, bearing these tax-receivable coupons, the legislature reassembled, and repealed the funding act, March 7, 1872, so far as to forbid the further issue of bonds bearing tax-receivable coupons; allowing, however, the funding to continue in all other respects the same. It also passed an act forbidding the collectors of taxes to receive the coupons that had been issued, in payment of taxes. The creditors of the state, deeming this to be an act that impaired the obligation of the coupon contract, at once attacked it in the courts; and the supreme court of appeals of the state held it to be unconstitutional and void in the case of *Antoni* v. *Wright*, 22 Grat. 833. For a number of years after this decision the coupons were regularly received in payment of taxes, but in the mean time a political party was being formed which aimed at destroying the coupons by legislation based upon the decision of the supreme court of the United States in the case of *Tennessee* v. *Sneed*, 96 U. S. 69, by pretending to change the remedy for the enforcement of the contract. This political party came into control of the whole state first in the winter of 1881–82. It at once proceeded to enact its party policy in the form of statutes. It passed, January 14, 1882, an act which in substance provided that no coupons should be received in payment of taxes except under the conditions prescribed in that act. Reciting that there were many counterfeit, forged, and spurious coupons in existence, (as a matter of fact none had ever been

known to exist, and none have ever been found,) it provided that, when a tax-payer desired to pay his taxes in coupons, he should pay the amount of his tax-bill in money, and surrender his coupons to the collector at the same time, who should deliver them to the county or corporation court, where a jury should pass upon the question whether they were genuine or spurious. If the jury found them genuine his money was to be refunded to him.

The creditors at once attacked this act as one impairing the obligation of their contract. It went to the supreme court of the United States, where its validity was maintained. *Antoni* v. *Greenhow*, 107 U. S. 769; S. C. 2 Sup. Ct. Rep. 91. While maintaining the validity of the act as applied to the case where a tax-payer sought to force the state actually to receive his coupons, the court very distinctly intimated that there might be a wide difference between that case and the case in which a tax-payer tendered his coupons, and stood upon that tender, and refused to pay in any other medium. Cases built upon this idea were immediately brought before the supreme court. A tax-payer offered coupons, which were refused. The collector, carrying out the provisions of the state law, levied on the tax-payer's property, and sold it. The tax-payer sued him for a trespass. He justified his conduct by authority of the state law, which the tax-payer said was unconstitutional and void. The question coming before the supreme court of the United States, it held that a tender of the coupon pays the tax so far as to deprive the collector of all power to collect thereafter in another medium, and that any and all acts of the Virginia legislature were powerless to protect him from the consequences of his trespass in making that levy. *Poindexter* v. *Greenhow*, 114 U. S. 270; S. C. 5 Sup. Ct. Rep. 903; *Barry* v. *Edmunds*, 116 U. S. 550; S. C. 6 Sup. Ct. Rep. 501; *Taylor* v. *Chaffin*, 116 U. S. 567–572; S. C. 6 Sup. Ct. Rep. 518; *Royall* v. *Virginia*, 116 U. S. 572; S. C. 6 Sup. Ct. Rep. 510.

After the last decisions of the United States supreme court on this subject, it was very evident that the state would be forced to redeem her coupons, unless some new legal barrier could be interposed. The legislature of Virginia, being in session at the time, determined upon the policy of resistance to the law as defined by the supreme court. Accordingly, on the twenty-fourth February, 1886, it enacted the following statute:

"Be it enacted by the general assembly of Virginia, that upon the application of any officer charged with the duty of collecting or settling taxes due the commonwealth, a board, consisting of the attorney general, secretary of the commonwealth, auditor of public accounts, second auditor, and treasurer, shall be authorized to ascertain and allow to such officer such sum or sums of money as they may deem just and proper to cover any liability and expenses incurred by, and any loss or damage accrued to, such officer, as the result of his collecting, or attempting to collect, enforce, or settle taxes due the commonwealth; and, for the amount so ascertained and allowed, the auditor shall draw his warrant in favor of such officer upon the treasurer, and

the same shall be paid out of any money in the treasury not otherwise appropriated. * * * The said board may prescribe rules and regulations in reference to such applications and allowances, if they shall deem proper so to do; but no such allowance shall be made unless the said board shall be satisfied that such officer used due diligence in protecting and defending the interests of the commonwealth in the matter touching which such allowance is asked for."

On the twenty-third March, 1886, the auditor of the state, to whom all the collectors of taxes look for instructions, issued a circular to each collector, wherein he instructed them to levy on and seize the property of any tax-payer who should offer to pay his taxes in coupons, and sell it by public auction, and the other members of the indemnity board, created by the above-recited act, indorsed this circular, and promised that every collector making these unlawful levies would be indemnified out of the treasury of the state. Fifty-one tax-payers, in various parts of the state, tendered coupons for their taxes due in the spring of 1886, and, refusing to pay with anything else, the collectors levied on their property, seized it, and sold it. Fifty-one suits were thereupon brought against these collectors, and this board of indemnity, in the circuit court of the United States for the Eastern district of Virginia, for damages for these trespasses. Two of them came on for trial before the Honorable H. L. BOND, the United States circuit judge, and the Honorable R. W. HUGHES, United States district judge for the Eastern district of Virginia, and a jury at Richmond, in October, 1886.

The facts in the first case were as follows: Mr. and Mrs. A. M. Willis, of Rappahannock county, Virginia, tendered to W. G. Miller, the treasurer of that county, $128 of the state's coupons in payment of the taxes due upon Mrs. Willis' farm. The treasurer refused to receive them, and levied on 3 horses and a colt, 10 head of cattle, 85 sheep, a wagon, and a buggy, all of which he advertised to sell at the door of the court-house. The levy was very excessive. The horse and colt alone would have brought more than enough to satisfy the tax. On the day of the sale he sold five head of the cattle, and returned all the other property to the plaintiffs. The plaintiffs therefore sued him for $10,000 damages.

After the plaintiffs had proved the foregoing state of facts, the defendants, who offered no testimony, moved the court to exclude that part of the plaintiffs' evidence which went to prove that the plaintiffs had endeavored to pay with coupons the portion of their taxes dedicated by the state constitution to the public free schools. The ground for the motion was as follows: It was argued that the act of assembly authorizing the issue of tax-receivable coupons was repugnant to the constitution of the state, and was therefore void, for the reason that the constitution dedicates one-fourth of the revenue to the establishment and maintenance of the public free schools; that the act makes *all* taxes payable in coupons, and therefore makes that portion dedicated to the free schools payable in coupons; that it might result

v.29F.no.6—16

from this that the entire revenue might come in in the form of coupons, and thus the public free schools be closed; and they recited, in support of this view, a decision of the supreme court of appeals of Virginia, rendered in the case of *Greenhow* v. *Vashon,* in the month of January, 1886, (Law J. Va., May, 1886, p. 299,) wherein that court held the act to be unconstitutional, for the reasons advanced.

The counsel for the plaintiffs replied that the identical question had been passed upon by the supreme court of appeals of Virginia in 1872, in the case before referred to, of *Antoni* v. *Wright,* and that court had then held that the act, in making the school money payable in coupons, was not repugnant to the constitution; that it had afterwards reaffirmed the same proposition in the case of *Clarke* v. *Tyler,* 30 Grat. 134, and *Williamson* v. *Massey,* 33 Grat. 237; and that the same question has been similarly passed upon by the supreme court of the United States in *Hartman* v. *Greenhow,* 102 U. S. 672, and in *Antoni* v. *Greenhow,* 107 U. S. 769, S. C. 2 Sup. Ct. Rep. 91, and that in such cases it was the rule of the federal judiciary to follow the first decision of the highest court of the state,—citing *Gelpcke* v. *Dubuque,* 1 Wall. 175, and the many cases since that case in which the supreme court had held to the doctrine of it. (A new set of judges for the court of appeals had been put in by the Readjuster party when it came into power in 1881–82, and it was this later court that made the decision relied on.) They also cited the cases of *Jefferson Branch Bank* v. *Skelly,* 1 Black, 436, *Northwestern University* v. *People,* 99 U. S. 309, and a number of other decisions of the supreme court of the United States for the proposition that where the question was whether an alleged contract of a state was repugnant to her own constitution, the federal judiciary would pass for themselves on the question, without regard to any decision which the courts of that state might have made; and they argued that as his honor was free to form his own opinion, unhampered by any decision which the supreme court of Virginia might have made, he could have no difficulty in coming to the conclusion, as the court of appeals of Virginia had done in the first instance, that the act was not repugnant to the constitution of the state, for that reason, or for any other reason.

The court overruled the defendants' motion to exclude this testimony, and, in doing so, the learned circuit judge delivered the following opinion.

*William L. Royall* and *George Bryan,* for plaintiffs.

*R. A. Ayers,* Atty. Gen., and *J. Randolph Tucker,* for defendants.

BOND, J. The court has listened with interest to the argument of the counsel upon the point now made that, since the act of 1884 which segregated the taxes levied by law and collected by its treasurers, the right to tender coupons in payment of the state school tax was no longer allowable. By the act of 1871 the coupons tendered in the case by the plaintiff in payment of his state taxes were

made receivable for all public taxes and dues. The supreme court of the United States has decided that this was a contract between the state and the coupon holder which no subsequent legislation could impair, and we cannot now see why the fact that the legislature has altered the method of collecting the school tax, or the method of its distribution, or the fact that it has segregated it from the gross tax collected, can alter its contract to receive its own evidences of debt in payment of that tax. It is a public due. The tender of a coupon is the tender of a receipt of so much money already in the state treasury. If the money represented by the coupon is not in the treasury, it is as much the duty of the state to have it there as it is to support the public schools. The one is as much a sacred trust as the other. So far as it may be maintained that the act of 1884 forbids the receipt of tax-receivable coupons for any state tax, to that extent it is in violation of the constitution of the United States, as has been decided again and again by the supreme court, and no device of division or segregation or distribution of any particular state tax will avoid this fatal defect.

The circuit judge then delivered the following instructions to the jury:

BOND, J. If the jury find from the evidence that the plaintiffs in this action, being citizens of Virginia, were indebted to the state in the sum of $128.24 for taxes due upon the property owned by them in Rappahannock county, in that state, and that, in payment thereof, they tendered to Miller, treasurer of the said county, entitled to receive the same, coupons of the bonds of the state of Virginia receivable for public taxes, and that said treasurer refused to receive the same in payment thereof, and that notwithstanding such tender the defendant levied upon the property of the plaintiffs, advertised and sold the same, and so collected the tax, then the said Miller was a trespasser, and is liable to the said plaintiffs for his trespass.

And if the jury find from the evidence in the cause that the other defendants to this action, or either of them, advised and counseled the said Miller to commit the trespass above described, by advising him not to receive the said coupons, but to make the said levy, with a promise of indemnification if he was mulcted in damages for his conduct, promising the assistance of counsel to defend him, then the said defendants are jointly liable with the said Miller, the treasurer, for the trespass alleged; and the jury may find such of the defendants guilty or not guilty as they may find they did or did not so advise, counsel, and abet the above-mentioned trespass.

And the jury are instructed that it is the law of the land that upon the tender of the tax-receivable coupons for the payment of taxes, whether received or not, the taxes are paid, and any levy upon the property of the tax-payer, after such tender, is a trespass (any state law to the contrary notwithstanding) for which damages are recover-

able; and if the said levy is made with a knowledge, at the time, that it is illegal, while the tax-payer remonstrates that it is illegal, and claims the protection of the law of the land, then the jury may find that said levy was malicious, and are not confined to giving actual damages, but may give punitive or exemplary damages, as they may find the facts to be.

And the jury are instructed that the meaning of the word "malice" in law is not personal hate or ill will of one person towards another, but it refers to that state of mind which is reckless of law and of the legal rights of the citizen in a person's conduct towards that citizen; and the object of the law, in permitting the jury to give exemplary damages or smart money in cases like this, is not only to indemnify the plaintiffs for the loss sustained, but to prevent similar actions upon the part of these and other defendants in the future.

The court instructs the jury that the plaintiffs were under no obligation to pay their taxes in money, and surrender their coupons for identification and verification, but they had a right, under the law, to stand upon their tender of coupons, and to refuse to pay in money and surrender their coupons for identification.

The jury found a verdict for $150 damages. The counsel for the plaintiffs moved to set the verdict aside upon the ground of inadequacy, but the circuit judge overruled the motion, saying that he could not tell how far the jury might have been influenced by the argument respecting the decision of the Virginia court of appeals on the school-tax question, which it would have been legitimate for the jury to consider in mitigation of damages.