Adeline H. **STEVENS**

v.

**ABBOTT, PROCTOR & PAINE**

v.

Alfred S. **WINSTON, Jr.**

**Civ. A. No. 5346.**

United States District Court
E. D. Virginia,
Richmond Division.

Aug. 6, 1968.

Henry J. Cappello, Washington, D. C., for plaintiff.

George R. Humrickhouse, R. Colston Christian and John O. Peters, Williams, Mullen & Christian, Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

The plaintiff herein, a housewife with no business training, married to a portrait artist, is a high school graduate and attended a girls' finishing school. Her husband has a limited education and the record is devoid of any particular business acumen on his part. The plaintiff has never been gainfully employed and the Court finds that she is utterly naive and unsophisticated in reference to financial transactions. To adequately describe plaintiff's lack of sophistication in financial matters would be a herculean task. Suffice it to say, on being questioned as to the difference between a stock and a bond, answered in effect "stocks have names and bonds don't."

In 1956, the plaintiff inherited from her mother a portfolio of securities which up until 1960 had been handled by the Trust Department of the First and Merchants National Bank of Richmond, Virginia, the bank acting as Trustee in a managing agency account. During the years between her mother's demise and

October of 1960, plaintiff's needs for funds from her securities account were met from dividends and interest generated by the securities, and there was to all intents and purposes no active trading of securities in the account as handled by the bank.

The individual defendant, Winston, a man who is now 70 years of age and described by one witness as a person who has not been in good health for over thirty years, is a registered representative who has been in the employ of the defendant, Abbott, Proctor and Paine, and its predecessor, in excess of forty years. Winston had previously acted as a registered representative in handling the plaintiff's mother's account prior to her demise and had been a person in whom plaintiff's mother placed a great deal of faith, and who has been known to the plaintiff since her childhood, he Winston, having been a patient of plaintiff's father, a physician, now deceased.

Up until the time of the death of plaintiff's mother, plaintiff had relied to a great extent upon her mother's advice and had had a small account, through the defendant, Winston, with the defendant firm, Abbott, Proctor and Paine, some twenty-five years prior to the instant case. The Court finds that at the time the plaintiff initiated her original account with Abbott, Proctor and Paine, in 1940, an account card was compiled which showed "Account not likely to be active."

In October of 1960 plaintiff contacted Winston and advised him that she wished him to handle her account and likewise advised him that she had been receiving from the bank from her investments the sum of $500.00 per month and wished to continue to receive that. Winston readily accepted the account, although no new account card was prepared, nor were any amendments made to the account card of 1940, to the end that anyone who might perchance examine the account card would find thereon the notation "Account not likely to be active."

The Court finds that as a result of the plaintiff's contact with Winston in October of 1960, the stock portfolio was transferred to the management of Abbott, Proctor and Paine through the defendant, Alfred S. Winston, Jr. The plaintiff, in effect, turned over the handling of her financial affairs, insofar as the stock portfolio was concerned, in toto to Winston.

Contacts between Winston and the plaintiff were fairly infrequent and Winston prepared the necessary documents in order to have the stock transferred so as to be carried in a "street name," [1] to the end that her signature was not required in the selling of securities in order to effectively transfer same. All papers necessary to secure the stock portfolio from the bank were prepared by Winston and executed by the plaintiff, and the Court is satisfied the plaintiff had no intelligible understanding that by so executing the documents, the stock was being removed from her name to "street name", but executed the documents with the understanding that such execution was necessary in order to permit defendant, Winston, to handle her transactions.

The Court finds that contra to the claim of Winston that he received the plaintiff's approval prior to each transaction, he was given what amounted to a discretionary account,[2] the plaintiff having injected herself only once when she spoke to Winston about a stock that a portrait subject of her husband had suggested.

Within a short period of time after commencing to handle plaintiff's ac-

---

1. Securities held in the name of a broker instead of the customer's name are said to be carried in a "street name."

2. Discretionary account: An account in which the customer gives the broker discretion, as to the purchase and sales of securities or commodities, including selection, timing, and price to be paid or received.

count, Winston turned it into an active trading account.

No written authorization was ever solicited from the plaintiff by the defendants in order to deal with her account as a trading account or otherwise. The Court finds that Winston, acting as the agent for Abbott, Proctor and Paine and in the scope of his employment as a registered representative, represented to the plaintiff that he could make more money for her than she was getting from the Trust Department of the bank, and the plaintiff in her own mind had no doubt until the year 1966, and indeed, she was so led to believe by the defendant, Winston, that he was at all times working in her best interests, in the handling of an investment account.

What little contact the parties had after 1960 was usually generated by the plaintiff's calling the defendant, Winston, to make requests for additional funds. Winston was well aware that plaintiff's income from her stock portfolio was an important source of her own and her family, and her primary security. Although she had been drawing the sum of $500.00 per month from her investments while they were being handled by the bank, and in spite of the fact that Winston had suggested to her that such a draw could be increased, her drawings were to a great extent irregular for the first year or so, although in the year 1963 arrangements were made with the defendants to cause to be sent directly to the plaintiff's daughter a certain sum per month, which subsequently was increased.

Winston, the Court finds, failed to explain to the plaintiff the risks to be incurred by the active trading in which he engaged, nor did he, according to his own testimony, feel it was his duty to explain to the plaintiff that there were extra risks to be expected in any active trading. Defendant, Winston, was not familiar with many of the Securities and Exchange Commission rules as he was likewise unfamiliar with many of the rules of the New York Stock Exchange.

Until January 1966 the plaintiff was not aware of the fact that the defendant, Winston, was paid on a commission basis. Although Winston claims prior approval by plaintiff on all transactions, the record shows that during one or more periods the plaintiff was not available for any such confirmations. In one instance plaintiff was in Europe for a period of approximately six weeks. Although admitting he was not an analyst, the Court finds that if the defendant, Winston, used the Research Department available to him through Abbott, Proctor and Paine in connection with the plaintiff's account, it was done on an extremely infrequent basis. There is little in the record before the Court to show that the turnover of the plaintiff's stock by the defendant, Winston, was based upon any special analytical method, but the record indicates same was generated to a great extent on the defendant, Winston's, own opinions as to the fluctuations the market might take. There can be no doubt but that Winston was exercising his sole discretion in the buying and selling of the plaintiff's securities almost from the beginning of their relationship in 1960.

The Court finds that the plaintiff's account represented a major account responsible for much of Winston's earnings commencing with the year 1961. The record shows that in at least two years the commissions or concessions earned by the defendant, Winston, from plaintiff's account alone amounted to in excess of 40% of his yearly earnings. Between 1960 and 1965 defendant, Winston, averaged more than one transaction in the plaintiff's account every working day. Not counting the securities in the original portfolio, Winston made over 550 sales of securities of which about 85% were held less than six months, 70% ninety days or less, and 39% thirty days or less.

The Court finds that Winston continually represented to the plaintiff that his manner of handling her account was resulting in profits, when in fact an analysis of same showed that for at

least three years the trading in the account caused losses, which losses were masked by virtue of the defendant's selling securities from the original portfolio representing large accrued capital gains.

The Court has no difficulty finding from the entire record that the primary and overlying purpose for Winston's establishing plaintiff's account as a trading account in contrast to an investment account was for the purpose of generating commissions, and the manner in which plaintiff's account was handled evidenced a gross indifference to the duty owed the plaintiff. See Norris & Hirshberg v. Securities & Exchange Comm., 85 U.S.App.D.C. 268, 177 F.2d 228–233 (1949).

The Court finds that the plaintiff neither directly nor indirectly acquiesced in the course of "trading" in her account as engaged in by the defendant, Winston.

The inter-office procedures of the defendant, Abbott, Proctor and Paine, required that any account which had in excess of ten transactions per month was to be given special attention. Yet no effectual effort whatsoever was made by the brokerage firm, through its managing partners, to determine the relationship between Winston and the plaintiff, in spite of the fact that they knew, or should have known, that the plaintiff's account was one in which heavy trading was being done. One or more of the partners had actual knowledge that the plaintiff's account was, to say the least, an active trading account. Because of their confidence in the defendant, Winston, they failed to subject him to the same inquiry that undoubtedly would have resulted had someone other than he been handling the account. There was a requirement not only of the firm but of the New York Stock Exchange rules [3] forbidding discretionary accounts except under certain conditions and setting out the manner in which any such accounts were to be supervised.

The only effort made by any of the managing partners to ascertain the status of the account which led to the instant litigation, was to question Winston whose reply was to the effect that the plaintiff's account was not a discretionary account and was being handled as the plaintiff wished, which was accepted without question or without further inquiry or investigation. The record is devoid of any effectual effort or assumption of responsibility by Abbott, Proctor and Paine, through its partners, to give the plaintiff's account the special attention required. In spite of the fact that it was their duty to review the orders of the representatives, no check was made of his representative's book.

In short, the Court finds that by reason of the fact that Mr. Winston was a long-time associate, and by virtue of the managing partners special confidence in him, and contra to their responsibility, and contra to the rules and policies required by the New York Stock Exchange, they failed to adequately supervise plaintiff's account, even though a simple check of the account card of 1940 would have advised them either that that account card was the one under which plaintiff's account was being handled, which on its face showed the account was not likely to be active; or a simple inquiry would have indicated that no new account card had been executed nor was there any written authorization by the plaintiff for Winston to engage in the trading in which he was engaging. Their derelictions in these regards are perhaps understandable by virtue of their apparent affection for the defendant, Winston, but they are not excusable in law.

It is true that the plaintiff had her own certified public accountants prepare

---

**3.** N.Y.S.E. Rule #408—which in effect requires that before any discretion in the handling of a transaction for a customer may be exercised, there must be received by the brokerage firm the prior written authorization of the customer, and a partner must approve and initial each discretionary order entered by any registered representative on the day the order is entered.

her tax returns. But said accountants dealt directly with Abbott, Proctor and Paine and received such information relating to plaintiff's securities account from the defendants as necessary for them to prepare her tax returns. There is no reason for the Court to believe that the plaintiff was any more cognizant of the manner in which her account was being handled by reason of her signing the tax returns, as there is for the Court to believe she knew the difference between a stock and a bond.

While plaintiff regularly received, by mail, the customary confirmation slips showing each security transaction as made, as well as the customary monthly statements, many of the confirmation slips for secondary offers failed to show the commissions, mark-ups, or concessions paid to the broker. The Court finds that the plaintiff made inquiry of the defendant, Winston, concerning the large number of transaction slips, to the extent that she inquired whether she should continue to keep them, but that the defendant, Winston, informed her that it was not necessary and in fact encouraged her to destroy them.

An analysis of plaintiff's account leaves no doubt that there was excessive trading, the source of which was the defendant, Winston. A computation of the number of times the money invested in the account was "turned over," i.e. the turnover rate (the ratio of total cost of the purchases made for the account during a given period of time to the amount invested), was an average of two plus per year, and was clearly excessive. There was a considerable amount of "in-an-out" trading. The Dow Jones Industrial average rose from 571.93 on October 24, 1960 to 983.57 on January 31, 1966. The total of purchases and sales made by Winston amounted to approximately six and one half million dollars.

A striking example of the manner in which plaintiff's account was handled is evidenced by the fact that a summary of trades of secondary distributions resulted in net profits to Mrs. Stevens of approximately $3,500.00, while concessions to the defendant firm from the same trades amounted to over $11,000.00.

Capital gains taxes paid by the plaintiff as a result of the defendant's trading securities amounted to the sum of $34,921.00. As of October 24, 1960, the date plaintiff's portfolio was turned over to the defendants, it consisted of stocks in the amount of $204,600.01. The Court finds that the plaintiff had no knowledge of the manner in which her account was being handled until January of 1966. Except for 180 shares of American Telephone and Telegraph Company, which had not been traded out of the original portfolio, the capital gains (or losses) in all other issues had been fully realized. The defendants have received commissions and concessions in excess of $59,000.00.

Much of the trading appears to have been indiscriminate—approximately 22% represented less than investment grade securities as indicated by Standard and Poor Stock Guide.

While it may be argued that plaintiff by virtue of her confidence in the defendant, Winston, would have acquiesced in the manner in which her account was treated had she been advised by Winston that it was so treated, the Court finds that by virtue of Winston's knowledge of her lack of financial acumen there was a duty upon him not to use her account in such a manner as to result in a conflict of interest. The Court finds that the account was used first for the purpose of generating commissions, leading to the inevitable conclusion that this, in and of itself, represents a conflict of interest between the plaintiff and the defendant, Winston, and a violation of the obligation under Rule 401 of the New York Stock Exchange that there shall be adhered to the principles of good business practice in the conduct of the affairs of a stock brokerage firm. The defendants, by the use of means and instrumentalities of interstate commerce and of the mails and of the facilities of a national securities exchange, engaged in a course of conduct which in law operates as a fraud upon the plaintiff in

connection with the purchase and sale of securities.

Plaintiff has urged upon the Court by way of her complaint three causes of action, the first of which allegedly constitutes a violation of certain anti-fraud provisions of the Securities Act of 1933, as well as the Securities Exchange Act of 1934, certain of the Securities and Exchange Commission rules, violations of the Securities Act of the Commonwealth of Virginia, and common law fraud.

Section 17(a) of the Securities Act of 1933 states:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in· any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." [4]

Section 10 of the Securities Exchange Act of 1934 states:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so regis-

tered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." [5]

Section 15(c) (1) of the Securities Exchange Act of 1934 states:

"No broker or dealer shall make use of the mails or of any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, any security (other than commercial paper, bankers' acceptances, or commercial bills) otherwise than on a national securities exchange, by means of any manipulative, deceptive, or other fraudulent device or contrivance. The Commission shall, for the purposes of this subsection, by rules and regulations define such devices or contrivances as are manipulative, deceptive, or otherwise fraudulent." [6]

The rules and regulations which have the force and effect of law and which were promulgated by the Commission pursuant to authority given by the above-quoted statutes read, so far as here pertinent, as follows:

Rule X–10B–5:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

"(1) to employ any device, scheme, or artifice to defraud,

"(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

---

4. 48 Stat. 84–85 (1933), 15 U.S.C.A. § 77q(a).

5. 48 Stat. 891 (1934), 15 U.S.C.A. § 78j.

6. 48 Stat. 895 (1934), as amended, 15 U.S.C.A. § 78o(c) (1).

"(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security."

Rule X–15C1–2:

"(a) The term 'manipulative, deceptive, or other fraudulent device or contrivance,' as used in Section 15(c)(1) of the Act, is hereby defined to include any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

"(b) The term 'manipulative, deceptive, or other fraudulent device or contrivance,' as used in section 15(c)(1) of the Act, is hereby defined to include any untrue statement of a material fact and any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, which statement or omission is made with knowledge or reasonable grounds to believe that it is untrue or misleading."

■ That the appropriate sections of the Securities and Exchange Act should be given broad and liberal interpretation in an effort to eliminate any undesirable practices is no longer open to discussion. See Moore v. Greatamerica Corp., 274 F.Supp. 490 (D.C.Ohio 1967). The statutory prohibitions and the Securities and Exchange Commission rules are based upon sound public policy.

Before entering into any detailed, legalistic conclusions concerning the merits of the plaintiff's plaint, there must first be considered the defendants' plea of Statute of Limitations.

## STATUTE OF LIMITATIONS

■ The facts as found by the Court lead the Court to the conclusion that the defendants are liable to the plaintiff for violation of Section 10(b) of the Securities Exchange Act,[7] amongst others. Congress has not provided a limitation period specifically applicable to suits involving the aforementioned. The principle cause of action, however, is primarily one in tort, based on fraud, and it has been held that the appropriate statute of limitations in such an instance should be that which is placed by State statute relating to same. See Lorenz v. Watson, D.C., 258 F.Supp. 724. See also, Hecht v. Harris, Upham & Co., 283 F.Supp. 417 (N.D.Cal.1968).

In Virginia a cause of action of which the gravamen of same is fraud shall be deemed to accrue, both at law and equity, at the time such fraud is discovered, or by the exercise of due diligence ought to have been discovered. The discovery which gave rise to the plaintiff's complaint in the instant case was in January of 1966.

The Court finds, giving full support to the doctrine of exercise of due diligence, that the plaintiff by reason of her confidence and faith in the defendant, Winston, and by reason of his actions, discovered the grounds for her complaint seasonably.

The Virginia Statute of Limitations in actions based on fraud provides for a five year statute. § 8–24 of the Code of Va.

The preamble of the Securities Exchange Act includes the phrase, "One of the primary purposes of Congress was to protect the general investing public." The genesis of the instant action is the conduct of the defendant, Winston, which the law deems to be both fraud and actionable.

It may well be that Congress' failure to provide a limitation period specifically applicable to the matter here pending, was by virtue of its recognition, as the Courts have recognized, that the investing and usually naive public needs special protection in this specialized field. See Norris and Hirshberg v. Securities & Exchange Comm., 85 U.S.App.D.C. 268, 177 F.2d 228 (1949).

7. 15 U.S.C. § 78j(b), SEC Rule 10b–5.

In the instant case the Court is satisfied that the one year statute of limitations contained in 15 U.S.C.A. § 78cc(b) is not applicable, and since with the exception of that portion of the complaint which alleges violations of the Virginia Securities Act, the plaintiff's suit has been instituted within all other statutory periods referred to in the Virginia Code, there is no necessity for the Court to become involved in a search for a limitation period.

■ Defendant's argument that laches should be assessed against the plaintiff is answered in the very nature of the fact that the doctrine is an equitable one as contrasted with a legal one. While undoubtedly the doctrine of laches might well be applicable in the appropriate case, it is not applicable in the instant case.

It cannot be said that the plaintiff failed to timely disaffirm the defendant's actions since this would presuppose that the plaintiff was cognizant of the defendant's actions which were enuring to her detriment.

The Court's finding forecloses any application of the doctrine of laches. In short, the suit was timely commenced. See Hecht v. Harris, Upham & Co., supra; Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962).[8]

The Court finds that the Statute of Limitations provided in the Virginia Securities Act requires that action be brought within two years after the transaction upon which it is based. See Va.Code § 13.1–522(d). Insofar as any actions of the defendants which would give rise under the Virginia Securities Act to a cause of action against them, the plaintiff in the instant case would be limited to transactions immediately preceding those which occurred two years prior to the institution of the suit. This, however, becomes immaterial and of no consequence. Since the very purpose of the Virginia Securities Act, known as the "Blue Sky Law," is primarily to suppress the sale of stocks of little or no value, which is not the gist of this action, and since the Court finds that the defendants have been guilty of churning which brings forth implied cause of action under the Federal Statutes, any further consideration of the Virginia Securities Act is unnecessary.

## JURISDICTION

Jurisdiction of the Court is obtained by virtue of 15 U.S.C. § 78aa; 78j(b); 78o(c) (1).

## LIABILITY

The defendant, Winston, throughout all of the time pertinent to this action and in connection with the handling of the plaintiff's account, acted as the agent for Abbott, Proctor and Paine, the defendant partnership, who are engaged in the stock brokerage business, with offices in Richmond, Virginia, and elsewhere, and who are members of the New York Stock Exchange and of the National Association of Securities Dealers.

■■ A private right of action may be based for violation of the remedial legislation into which category the Securities Exchange Act quite clearly falls. See Tcherepnin et al. v. Knight et al., 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Liberal construction must be given to remedial statutes. J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). One of the basic Congressional purposes of the acts unquestionably is for the protection of investors.

■■ The instant case is, to all intents and purposes, a churning action. The Court's research indicates a limited number of cases involving the issue of "churning", and it would appear to the Court that these cases have uniformly held that a cause of action under the Securities Acts for fraudulent conduct is implicit in "churning." Churning essentially involves improper purpose on the part of a broker to derive profits for himself with little regard for the interests of his customer. And it is no long-

8. See also, 3 Loss Securities Regs. 1772, 1777 (2d Ed.1961).

er open to argument that such a procedure amounts in law to a fraud and represents a manipulative device or contrivance within the meaning of Section 10(b) of the Securities Exchange Act, supra, and results in a practice which in law operates as a fraud and deception within the meaning of SEC Rule 10-B(5).

■ It is argued that there is no right of action created for violations of the Securities Exchange Act. In short, the defendants argue that unless the Congress specifically and directly spells out a right of action the same may not be implied. That there is a cause of action for churning, it would appear, is no longer open to argument. See Lorenz v. Watson, 258 F.Supp. 724 (E.D.Pa. 1966); Carr v. Warner, D.C., 137 F. Supp. 611; and Hecht v. Harris, Upham & Co., supra. See also Moscarelli v. Stamm, 288 F.Supp. 453, July 12, 1968 (E.D.N.Y.). Congress can, if it so desires, eliminate implied rights of action by expressed statutory provisions. No such action has been taken by Congress in reference to the Securities Exchange Act although it is undoubtedly aware of the existence of private implied rights of action based on violations of the Act.[9]

■ An injury resulting from a breach of a statutory duty to a person such as the plaintiff, who belongs to the class intended to be protected, may be compensated in a private action. See Wyandotte Transp. Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, at 386, 19 L. Ed.2d 407 (1967).

■ In determining whether or not an account has been churned, the courts look to, amongst other things, the number of trades and the frequency thereof, the turnover rate, the "in-and-out" trading, the amount of commission earned, the length of time the securities are held, and the percentage of the representative's income. Considering all of the aforementioned factors, when the manner in which the plaintiff's account was handled by the defendants is examined, the Court is led to the inevitable conclusion that the trading account which resulted from the defendant's handling of same results in the device of churning what was to be an investment account. But even treating accounts which admittedly result in greater activity than those in which the primary purpose is investment may be considered under the excessive trading principle where, because of the customer's known financial condition, her expressed wishes, or the nature of the account, the representative being in control of and responsible for the character of the trading is under an obligation to avoid the creation of the risks attending active trading.

In addition to some of the factors to which the Court has heretofore referred, the Court is under a duty to consider the misrepresentations by the defendant, Winston, made to the plaintiff, and the apparent masking of trading losses without intelligible regard to the tax effect of the plaintiff; and the defendant, Winston's assumption of absolute control of the plaintiff's account further strengthens the Court's ultimate conclusion. See Hecht v. Harris, Upham & Co., supra.

■ The defendant, Winston's relationship with his uninformed customer was one of special trust and confidence, and the Court finds that he was, because of this position, under a duty to frankly and forthrightly explain to plaintiff the nature of the commissions, concessions, losses and profits which were being generated in her account.

The Court finds that the defendants' conduct represents violations of the rules of fair practice of the N.A.S.D.; that plaintiff's account was not properly

9. Statement of Securities and Exchange Commission. Hearings on S.1642 before the subcommittee on Securities of the Senate Committee on Banking and Currency, 88th Cong.; 1st Sess. 55 (1963); Hearings on H.R. 6789 and H.R. 6793 before the subcommittee on Commerce and Finance of the House Committee on Interstate and Foreign Commerce, 88th Cong.; 1st Sess. 118 (1963).

supervised in accordance with paragraph 2 of Rule 435 of the Rules of the New York Stock Exchange;[10] and that her account was not properly supervised as required by Rule 405 of the New York Stock Exchange.[11] The power of the Securities and Exchange Commission to make such rules and regulations as may be necessary for the execution of the functions vested in it by the Securities Exchange Act of 1934 is contained in that Act.

The actions of the defendant, Winston, in the commission of his acts and the omission of certain of his responsibilities, as well as the omission on the part of his principal, show a violation of each in reference to their obligation to the plaintiff, for which they must be held liable.

In short summary, in determining whether churning has occurred, the totality of the circumstances must be considered and the mere fact that overall net profit was made would not justify the churning of the account. The Court has found, in an analysis of the manner in which the plaintiff's account was handled, that the profit and loss from the sale of issues by the defendants which were contained in the original portfolio amounted to a net profit of over $106,000.00. The net profit from the sale of securities brought into the account by the defendant, Winston, represented a net profit of approximately $19,000.00.

The overall pattern, as indicated by the Court's findings, shows: an excess amount and number of trades; masking of trading losses by sales of the plaintiff's blue chip securities; little regard, if any, on the part of the defendant, Winston, as to the tax effect upon the plaintiff; a pattern of "in-and-out" trading; the high percentage of the defendant, Winston's, earnings from the plaintiff's account; and, while it is true that the amount of concessions on secondary offerings were frequently absent from the confirmation slips, the Court finds this to have resulted from simple negligence and, in any event, would be of little consequence under the existing circumstances. The defendants are liable for having churned the plaintiff's account. See Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961); Fischman v. Raytheon Manufacturing Co., 188 F.2d 783 (2d Cir. 1951); Kardon v. National Gypsum Co., D.C., 73 F.Supp. 798.

In view of the Court's finding, it is apparent that a fiduciary relationship in law existed between the plaintiff and Winston which placed upon him the duty of acting in the highest good faith toward the plaintiff.

## COMMON LAW FRAUD

While the gravamen of an allegation of churning is fraud, it is fraud in law and differs from common law fraud, not the least difference of which is in the burden of proof. In civil cases, the plaintiff's burden of proof

---

10. New York Stock Exchange Rule 435 provides in part: "No member, member organization, partner or stockholder therein shall: * * * (2) Execute or cause to be executed on the Exchange purchases or sales of any stock for any account with respect to which he or it or another partner or stockholder therein is vested with any discretionary power, which purchases or sales are excessive in size or frequency in view of the financial resources in such account."

11. N.Y.S.E. Rule 405 provides in part: "Every member organization is required through a general partner or an officer who is a holder of voting stock to (1)

Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization * * * (2) Supervise diligently all accounts handled by registered representatives of the organization." (Cf. R. H. Johnson & Co. v. Securities & Exch. Com'n, 2 Cir., 198 F.2d 690, 693, fn. 7; Lowenfels, Implied Liability Based Upon Stock Exchange Rules (1966) 66 Col.L.Rev. 12, 13–16).

to prove the action is measured by the rule of "preponderance of the evidence," such as the Court has applied to the charge of churning. However, an allegation of common law fraud places upon him, who charges it, the burden to prove same by clear, cogent, and convincing evidence, which is obviously a much stricter standard. See Reiber v. James M. Duncan, Jr., & Assoc., Inc., 206 Va. 657, 145 S.E.2d 157, 161 (1965); Wolford v. Williams, 195 Va. 489, 78 S.E.2d 660, 665 (1953); Bank of Pocahontas v. Ferimer, 161 Va. 37, 170 S.E. 591, 593 (1933); 9 Wigmore Evidence § 2498 at 329 (3d Ed.1940).

■ While the Court has had no difficulty in finding from the evidence by a preponderance of the evidence the act of churning, the Court cannot say that the plaintiff has borne the burden of proof by clear, cogent and convincing evidence that the defendants were guilty of common law fraud. Hence, the third cause of action is dismissed.

## EXEMPLARY OR PUNITIVE DAMAGES

The plaintiff contends that where there has been tortious conduct such as to evince a wilful disregard for the rights of plaintiff, that she is entitled to exemplary or punitive damages.

■ Exemplary damages have a two-fold purpose—one, to indemnify the plaintiff for the loss sustained, and two, to prevent similar actions upon the part of the responsible party and others in the future. See Willis v. Miller, C.C., 29 F. 238, 244. See also, Hecht v. Harris, Upham & Co., supra.

■ The Court finds that the conduct engaged in in the instant case results from the failure of the defendants to abide by their legal responsibilities, but finds no reason to believe that by awarding exemplary or punitive damages, actions in the future similar to those which give rise to the instant suit would be any more deterred than by virtue of the fact that the suit itself has accomplished that very result. The Court does not feel that by refusing to award exemplary or punitive damages the plaintiff is being injured.

While we agree that the practices of the defendant, Winston, and the acquiescence in same by the defendants, Abbott, Proctor and Paine, by their failure to properly supervise the said Winston, when viewed in the setting portrayed in this record must be described as manipulative, deceptive and fraudulent; yet bearing in mind that the protection to the public comes about through the illumination of such practices as occurred in this case, there is no reason, in equity or law, why when a plaintiff can be adequately compensated by compensatory damages she should be unduly enriched. A suit of this nature brought against people of prior impeccable reputation is a sufficient deterrent to any future similar conduct, hence exemplary or punitive damages will not be awarded.

## ATTORNEYS' FEES

The plaintiff contends that she is entitled to have the Court consider in the assessment of damages an amount as and for attorneys' fees.

■ The general American rule is that absent a contrary provision of statute, rule of court or contract, or a contrary requirement of applicable state law, the prevailing party in an action in Federal Court is not entitled to counsel fees. See Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967).

This rule is supported by overwhelming authority. See 6 Moore's Federal Practice, § 54.77(2) at 1348, 1349; 22 Am.Jur.2d, Damages, § 165 at 234 (1965); Annot., Right To Counsel Fees In Federal Court, 8 L.Ed.2d 894 (1963).

Notable exceptions to the rule are:

■ (1) The "fund" theory: based upon the historic equity jurisdiction of the Federal Court, the Court has the discretion to award counsel fees to a party who, having a common interest with other persons, maintains a suit for common benefit and at his own expense,

resulting in the creation or preservation of a "fund" in which all those having a common interest share. See Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157 (1882); Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939). No basis exists for application of this theory.

And, (2) the "conduct" theory: in extraordinary cases involving groundless, oppressive, vexatious conduct and cases in which the Federal Courts have authority, as a part of their historic equity jurisdiction, to award counsel fees. See Local No. 149, etc. v. American Brake Shoe Co., 298 F.2d 212 (4th Cir. 1962).

 In the instant case, the interest of justice does not require the awarding of counsel fees.

## COMPENSATORY DAMAGES

 Obviously, the principle of damages to be applied is, consistent with the evidence, to attempt to compensate the plaintiff for the wrongs inflicted upon her. Damages, however, are not presumed, nor may they be based upon speculation. The burden is upon the plaintiff to prove by a preponderance of the evidence, or with reasonable certainty, any item or element of damage claimed, and that it is properly attributable to the tortious conduct of the defendants.

 Obviously, it is not always possible, or even probably, that a plaintiff can prove with mathematical precision the exact sum of his damage. It is required, however, that a plaintiff furnish evidence of sufficient facts and circumstances to permit an intelligent and probable estimate thereof. Barnes v. Graham Virginia Quarries, Inc., 204 Va. 414, 420, 132 S.E.2d 395, 398.

Obviously, the Court's responsibility to conclude the proper measure of recovery in a churning action is complicated primarily by the difficulty of calculating what was lost as a result of the churning. See 80 Harv.L.Rev. 869 (1967). The prior cases indicate three measures for recovery—one being the quasi-contractual recovery of the profit made by the dealer, recovery for damages on an "out-of-pocket" measure, and recovery for damages on a "loss of bargain" measure.

 Taking the aforementioned suggested theories in inverse order, the loss of bargain recovery is an attempt to award the plaintiff the profits that a properly managed account may have yielded. This however, requires the Court, to a great extent, to engage in speculation and conjecture. First, the Court would be required to use an arbitrary interest rate and compound same annually on the initial value of the securities; or, in the alternative, to use a measure such as the Dow Jones Industrial Index, which during the period with which the instant case is concerned showed a rise of 71.8%. The fallacy in this approach, however, is that it requires the Court to ignore the fact that even "properly managed accounts" are subject to losses, and, second, it imposes upon a defendant stock broker a presumption that being an expert he is endowed with unparagoned powers of prediction, and this the Court is not willing to do. Indeed, to so do would require the Court to blind itself to the financial facts of life and would, in the Court's opinion, amount to the awarding of punitive damages under the guise of compensatory damages. It seems to the Court to be more equitable and justice requires that the amount awarded be based, insofar as possible, upon the unemotional, mathematical evidence elicited throughout the trial as to what actually took place in this plaintiff's account.

 The next suggested standard of recovery is sometimes called the "out-of-pocket" recovery. Any such recovery, however, is arrived at under the erroneous assumption that all of the transactions involving plaintiff's account were improper. This, of course, is not, in the Court's opinion, a proper basis for can it be said that if a profit is made no damages are to be awarded in a churning case? The fact that an account may have showed a net profit is not an absolute defense to a charge of churning.

See E. H. Rollins and Sons, Inc., 18 SEC 1–371.

There is authority that would permit the Court to compute the damages by ascertaining the value of the securities at the time they were turned over to the defendants; and second, to treat same as if they were simply dormant for the period involved, ascertain the amount of dividends and income that would have been forthcoming from the alleged dormant securities, and deduct therefrom the value of whatever withdrawals were made by the plaintiff, see Twomey v. Mitchum, Jones & Templeton, Inc. et al., Cal.App., 69 Cal.Rptr. 222, filed June 5, 1968; and third, to ascertain the value of the original portfolio as of the time it was returned to the plaintiff in 1966. To so do, however, would be to ignore the fact that regardless of how unsophisticated and financially naive the plaintiff was, she is bound to have known that one who deals in the stock market, regardless of in how conservative a manner, stands not only the chance to have her securities appreciate in value, but likewise stands the chance that same may depreciate. The stock market, which has been referred to as the heartbeat of American economy, is well known for its fluctuations. To use this theory in determining the damages is to impose upon the defendants a much higher standard than anyone has a right to expect. In determining what is a properly managed account, even financial experts may well differ. Another factor which precludes the use of this theory is the fact that the portfolio returned to the plaintiff was described in the evidence as an excellent one for her purposes. The wrong inflicted upon the plaintiff came about by virtue of the churning, which resulted in a reduction of her equity, and this the Court feels can be ascertained with a much greater degree of certainty.

Courts have used what is known as the quasi-contractual measure of damages, and in the case of Newkirk v. Hayden, Stone & Co., CCH Fed. Sec.L.Rep., '64–'66, ¶95, 319 (S.D.Cal. 1965); and Hecht v. Harris, Upham & Co., supra, the courts found that to be the commissions charged by the broker. Obviously, as the result of churning, the commissions resulted in a reduction of the plaintiff's equity. In addition, the excess trading examined as a whole resulted in additional capital gains taxes being assessed against the plaintiff, and insofar as it is possible and consistent with justice, the plaintiff's loss of equity in this regard should be assessed against the defendants.

It is correct, as the defendants point out, that it is, to say the least, to some degree speculative for the Court to say which capital gains were properly incurred and which, if any, improperly incurred. The defendants point out that if they are to be charged with taxes on capital gains improperly incurred, they should be given a corresponding credit for the fact that the cost basis of the securities in the portfolio returned to the plaintiff was about equal to the then market value of such securities, with the result that capital gains on future transactions with respect to those securities will be much less than capital gains on transactions involving the original securities. This suggestion, however, simply compounds the problem, and who is to say when any such securities will be sold, or what the tax rate will be at that time.

The Court must deal with the situation as it presently exists, bearing in mind that the plaintiff's damage was incurred by the defendants' actions. If anything, the burden was upon the defendants to come forward with evidence, if any they had, that the capital gains taxes were properly incurred. Such evidence as they had is the fact that the plaintiff's withdrawals from her capital account for personal use amounted to $28,678.54. Capital gains taxes incurred amounted to $35,831.78. Now it is quite true that some invasion of plaintiff's capital account was required to secure the aforementioned $28,678.54. To say that the defendants ought to have used the bonds in their hands for this pur-

pose (which, incidentally, appreciated in value very slightly) is to invite the Court once again to impose upon the defendants unparagoned powers of prediction.

It appears to the Court that the appropriate thing to do is as follows: Defendants received commissions and concessions in the amount of $59,689.99. This, of course, is an item of damage. In 1961, total taxes paid on capital gains, both Federal and State, amounted to $9,239.00. Plaintiff's withdrawal for her personal use that year was $1,500.-00, representing responsibility for 7.-0455% of the total tax, which percentage amounts to $650.93. In 1962, the tax on capital gains amounted to $10,-599.00; plaintiff's withdrawal for personal use amounted to $11,390.00 or 48.-5714% of the total tax, which percentage amounts to $5,148.08. (In 1963, the capital gains tax amounted to $2,083.00; plaintiff's withdrawal for personal use was $6,500.00 or 101.7055% of the total tax, which percentage amounts to $2,-118.53, representing $35.53 more than the actual tax paid. The Court finds it equitable to deduct from the ultimate damages the entire tax of $2,083.00 aforementioned.) In 1964 the capital gains tax amounted to $8,527.00; plaintiff's withdrawal for personal use was $6,909.52 or a percentage of 31.3158%, which percentage amounts to $2,670.30. In 1965, capital gains tax amounted to $4,473.00; plaintiff's withdrawals for personal use was $2,379.02 or 18.656%, which percentage amounts to $834.48. The plaintiff has failed to bear the burden required in order for the Court to ascertain what percentage, if any, of the capital gains taxes incurred in 1966 were incurred by virtue of the defendants' actions.

In addition to the commissions and concessions aforesaid and the $34,920 capital gains taxes less that portion attributable to the plaintiff by reason of her own personal needs, New York State imposes a transfer tax when a security is sold or transferred from one person to another through the New York Stock Exchange and, in addition, a seller is charged with a registration fee representing one cent for each $500.00, or fraction thereof, of the amount of all sales as specified in the Securities Exchange Act of 1934. It is impossible from the record for the Court to ascertain the exact amount of transfer tax and registration fee charged to the plaintiff on all sales made during the course of defendants' improper conduct, but the Court has ascertained from Exhibit S-16-A that she was charged with transfer tax at least in the amount of $995.08, for which she should be reimbursed.

Judgment will be entered for the plaintiff against the defendants in the amount of $85,059.00 which represents the figure of $59,689.99 commissions charged by the defendants, the figure of $995.08 transfer tax aforementioned, and the figure of $35,831.78 representing capital gains taxes incurred less that portion of said tax which in equity should be charged to the plaintiff. Interest on said judgment shall run from this date.

Plaintiff requests the assessment of extraordinary costs and while certain of the alleged costs are under no circumstances properly chargeable against the defendants under Rule 54(d) of the Rules of Federal Procedure, there are exceptional cases to the general rule which present equitable considerations and for dominating reasons of justice the Court customarily has power to make additional allowances of costs. In view of the fact that the defendants have, as yet, had no opportunity to inquire as to either the propriety, the reasonableness, or the necessity for the expenditure of the costs claimed by the plaintiff, leave is herewith granted the plaintiff to present such evidence by way of depositions or ore-tenus as she may be so advised to the end that the defendants be given an opportunity to cross examine any witnesses introduced in support thereof after which the Court will give further consideration to the assessment of extraordinary costs.