Mabtiít B. Steches, J.
On September 20, 1967, Marilyn Surgil, then 24 years of age, went to an office of Kidder, Peabody & Co. and opened a cash stock brokerage account. She revealed that she was unmarried, self-employed as a “consultant” — no other occupational information was given or, apparently, solicited —and she gave a bank as her sole reference. Investigation by the broker revealed that Miss Surgil maintained there a special checking account, usually accepted as evidence of the most modest of balances. (At the trial she acknowledged her liquid assets to have been about $300.)
The following day she ordered the defendant, as her broker, to purchase 800 shares of Cameo Parkway Records, a “high flyer ’ ’ then listed on the American Stock Exchange. The defendant executed the order at a total price including commissions of $36,131.29. The broker’s written confirmation specified September 27 as the settlement date.
The defendant promptly developed justifiable misgivings about the securities and the plaintiff’s ability to pay for them, and pressed for payment in a series of telephone calls followed by a telegram dated September 26, 1967. On September 27, the settlement date, Miss Surgil gave, and the defendant, as brokers, attempted without success to execute successive “ limit orders ” for the sale of the stock (sale at or above a designated price). Toward the end of the trading day the plaintiff ordered the securities sold at market, the price bid by would be purchasers; and the defendant, as her agent, executed the order.
This case differs from all similar cases called to my attention by a resulting net profit of $4,474.85.
The plaintiff demanded her profit. The defendant declined to make any payment until she paid the full purchase price. On clearance of her check, the defendant said, it would remit ■to her the entire sales price.
Efforts by plaintiff’s attorneys to have the defendant moderate its position were unavailing. On November 9, 1967 funds having then been provided by a friend, the plaintiff’s attorneys tendered to the defendant a bank teller’s check in the full amount of the purchase price; the plaintiff’s written and duly acknowledged instruction to the defendant to accept the funds for her account; and her direction to pay the proceeds of the sale to her attorney for her account. This tender was refused. As acknowledged in defendant’s trial memorandum, “ payment to plaintiff would be made only to plaintiff and not to plaintiff’s attorney in his capacity as attorney for plaintiff.” Acting on the instructions of the friend who provided the funds, plaintiff’s *475 attorney declined to make such payment and commenced this suit for the difference between the net sales and purchase prices.
Defendant having acted solely as plaintiff’s agent in buying and selling the securities, the profit belongs solely to the plaintiff (McIntyre v. Whitney, 139 App. Div. 557, affd. 201 N. Y. 526) and plaintiff is entitled to prevail unless the pleaded separate defenses are sufficient to mandate a different result. The answer alleges that plaintiff misrepresented her ability to pay for the purchased securities and “ therefore was not the purchaser of the 800 shares * * * acquired by the defendant.” At the trial and in its memorandum of law, defendant emphasized, almost to the exclusion of all other defenses, that plaintiff’s right of recovery was barred by the Securities Act of 1934 (IT. S. Code, tit. 15, § 78g, subd. [c]) and by regulation “ T ” of the Board of Governors of the Federal Reserve System (Code of Fed. Reg., tit. 12, § 220.4, subd. [c], par. [2]) promulgated thereunder.
The cited provisions of the Securities Act (U. S. Code, tit. 15, § 78g, subd. [c]) declares the extension of credit by any broker in excess of that permitted by the Board of Governors of the Federal Reserve System to be “ unlawful ’■’. Regulation “ T ” bars a broker from extending credit on the sale of stock to a cash account customer in excess of seven business days, and should the customer fail to make payment in full during such period, the broker is required to “promptly cancel or otherwise liquidate the transaction or the unsettled portion thereof ’ ’ (Code of Fed. Reg., tit. 12, § 220.4, subd. [c], par. [2]).
The defendant’s reliance on regulation “ T ” is misplaced. The seven business days referred to in the regulation would have expired on September 30, 1967; but the extension of credit terminated on September 27, 1967 with the sale of the securities at a price exceeding the purchase price. Furthermore, the obligation to “ promptly cancel or otherwise liquidate the transaction” was never obeyed. The broker placed all of Miss Surgil’s “ sell ” orders in accordance with her instructions, consummated the final such order, and confirmed to her, in writing “We executed this transaction (the sale) as your agent and solely for your account and risk”. The contention that the sale was a cancellation of the purchase is belied by the negotiation of the parties for six weeks after the sale. (Had the purchase in fact been canceled, the broker would have been prohibited from thereafter accepting the payment and reinstating the transaction [1940 F. R. B. 772; 2 C. C. H. Fed. Sec. L. Rep., par. 22, 216.16].)
*476 Should we treat the purchase and sale as two independent transactions deeming credit to have been extended until actual payment was made, the regulation ‘ ‘ T ” defense must still fail. Until cancellation takes place a customer is entitled to stock for which he has paid or tendered payment (Myer v. Shields & Co., 25 A D 2d 126). A valid tender was made on November 9. Too, a broker may not avoid his obligation by pleading the violation of regulation “ T,” whose purpose “ is the protection of the small speculator by making it impossible for him to spread himself too thin” (Myer v. Shields, supra, p. 127). Only the broker who improperly extends credit is penalized (Smith v. Bear, 237 F. 2d 79; Reader v. Hirsch & Co., 197 F. Supp. 111; Remar v. Clayton Securities Corp., 81 F. Supp. 1014; Moscarelli v. Stamm, 288 F. Supp. 453, 458).
The pleaded “misrepresentation,” or common-law fraud, is of no help to the defendant. In the absence of damage, fraud is not actionable (Sager v. Friedman, 270 N. Y. 472), and the rule is the same whether fraud is asserted as the basis of an action for damages or as a defense (Falk v. Goodman, 14 Misc 2d 964, 965, affd. 7 A D 2d 1014, revd. other grounds 7 N Y 2d 87; 37 C. J. ,S., Fraud, p. 219; 37 Am. Jur. 2d, Fraud and Deceit, p. 456; 24 N. Y. Jur., Fraud and Deceit, p. 269). Clearly the defendant sustained no damage. Even had damage occurred, the evidence would not sustain the claim of fraud. ‘ ‘ The fraud charged against the defendant herein [knowingly misrepresenting financial responsibility and attempting to obtain defendant’s property without paying for it] is of the nature of a crime, and cannot be presumed, but must be established by evidence. * * * The presumptions of the law are in favor of the innocence of the person accused ” (Morris v. Talcott, 96 N. Y. 100, 107). Whether the standard to be applied is the more rigorous requirement of proof of common-law fraud, or the lesser standard required to prove statutory ‘4 fraudulent and deceptive ’ ’ practices (U. S. Code, tit. 15, § 78j; Stevens v. Abbott, Proctor & Paine, 288 F. Supp. 836, 847), the evidence in fact shows that the plaintiff did not misrepresent her ability to pay for the securities. Miss Surgil answered all questions honestly which the defendant put to her. She claimed no apparent source of income or employment of a recognizable nature; and revealed a bank account which accurately represented her true fiscal status.
‘ ‘ The law does not deny the possibility of an honest purchase of goods on credit by an insolvent person, without a disclosure of the fact. He may have, not only an intention of paying for them when the credit expires, but a reasonable expectation of being able to do so. The true point of inquiry in such cases is, whether *477 there was a preconceived design not to pay for the goods ’ ’ (Hall v. Naylor, 18 N. Y. 588, 590).
The testimony of the plaintiff and her wealthy friend indicates that she expected him to provide the funds. While that faith may have been misplaced — borne out by his reluctance to ever allow her to obtain possession of the full .sales price — misplaced faith does not constitute fraud.
I recognize that a socially desirable result is to be achieved by keeping those without funds from speculating in the stock market (cf. Brod & Co. v. Perlow, 375 F. 2d 393); but that end is better achieved by the adherence of the financial community to the eleventh commandment of Wall Street: “ Know thy customer”. Nobody compelled defendant to extend $36,000 of credit to Miss Surgil (Busch v. Rothschild & Co., 23 A D 2d 189).
Judgment may be entered for the plaintiff against the defendant in the sum of $4,474.85 with interest from November 16, 1967, one week after the tender of the teller’s check to the defendant. If, as the parties seem to agree, payment of the purchase price was properly to precede delivery of the sales price, defendant had no right to refuse plaintiff’s instructions that delivery of the proceeds of the sale be made to her attorneys; and a reasonable time after tender of payment of the purchase price is deemed the date of breach from which interest shall be computed. All motions on which decision was reserved at the trial and which have not been otherwise decided are denied.