**Leroy J. BLACKWELDER, Appellant,**

v.

**Richard M. MILLMAN et al., Appellees.**

No. 74–1846.

United States Court of Appeals, Fourth Circuit.

Argued April 9, 1975.

Decided July 21, 1975.

Thomas J. Harrigan, Arlington, Va. (Harrigan, Morris & Artz, Arlington, Va., on brief), for appellant.

Grayson P. Hanes, Fairfax, Va. (John J. Sabourin, Jr., Hazel, Beckhorn & Hanes, Fairfax, Va., on brief), for appellee Continental Mortgage Investors.

Richard A. Hibey, Washington, D. C., for appellee Richard M. Millman.

George D. Varoutsos, Arlington, Va. (Louis Koutoulakos and Robert J. Arthur, Arlington, Va., on brief), for appellees Lester Dworman and Dworman Building Corp. (Charles Jay Pilzer, Ronald D. Jacobs, Jacobs, Pilzer & Speiller, Washington, D. C., on brief), for appellee Charles S. Bresler.

Before WINTER, CRAVEN and BUTZNER, Circuit Judges.

CRAVEN, Circuit Judge:

This is an appeal by Leroy Blackwelder from an adverse ruling, on defendants' motion for summary judgment, that his claim of conspiracy to defraud was barred by the statute of limitations because Blackwelder, at a time not within the limitations period, knew or should have known that he had a cause of action. Taking an entirely different view of the claim and those essential facts which are undisputed, we hold that Blackwelder's action is not time-barred and therefore reverse and remand for a trial on the merits.

I.

Some background history is necessary to understand the questions presented on this appeal. At the heart of this protracted litigation lies Moorefield Farms, a large tract of land in Fairfax County, Virginia, the ownership and profits from which have been in dispute in the United States District Court for the Eastern District of Virginia since 1964. Originally, John Sterling, represented by defendant lawyer Richard Millman, filed a diversity suit against his brother, David Sterling, Blackwelder, plaintiff here, and Mrs. Blackwelder, to settle their respective interests in Moorefield Farms. It was therein determined that David Sterling had deeded Moorefield to Blackwelder with a parol agreement that the latter would hold it in trust to secure compensation for Blackwelder's development of the parcel. John Sterling was also found to have been a subsequent assignee of one-half of David's interest.[1] Rejecting John's claim that the oral trust conveyance to Blackwelder should be rescinded, this court affirmed and remanded for a full accounting, noting that a physical partition might be neces-

sary. *Sterling v. Blackwelder,* 383 F.2d 282 (4th Cir. 1967) (*Blackwelder I*).

While *Blackwelder I* was pending, the lower court (Judge Lewis), without objection from the parties, conducted proceedings culminating in conformation of the sale of Moorefield to one Holladay for $1,000,000, receiving a deposit of $50,000.[2] That sale, however, was subsequently aborted—Holladay backed out in late 1967, claiming certain undisclosed encumbrances (public utility easements) on Moorefield.[3] Shortly thereafter, in March and April 1968, Judge Lewis received a bid from and confirmed sale of Moorefield to defendant Lester Dworman for $730,000. At Dworman's behest, and pursuant to a recorded assignment of his bid to defendant Paris Properties, Inc. (Paris), a Maryland holding corporation, title to Moorefield was placed in Paris in April 1968. Blackwelder appealed from this sale to Dworman; Millman, representing appellee John Sterling, asserted in this court in January 1969 that the $730,000 sale price was reasonable. Since Blackwelder had failed to file a proper supersedeas bond, we dismissed the appeal as moot. *Sterling v. Blackwelder,* 405 F.2d 884 (4th Cir. 1969) (*Blackwelder IV*).

Moorefield was then sold by Paris to DeLuca Enterprises in July 1969 for $1.35 million; DeLuca in turn mortgaged Moorefield to American Realty Trust by deed of trust as security for $1.8 million. Blackwelder, noting the obvious disparity in the selling prices for Moorefield, then advanced some rather serious charges to this court concerning Millman's role with Dworman in Paris' resale to DeLuca. At that time we were considering Blackwelder's appeal from the aborted sale to Holladay. In an unpublished opinion, we affirmed the re-

---

1. *Sterling v. Blackwelder,* C.A. No. 3207, Judgment (E.D.Va. Dec. 28, 1966) (hereinafter the 1966 judgment).

2. We upheld the confirmation by dismissing appeals by David Sterling and Blackwelder. *Sterling v. Blackwelder,* 387 F.2d 346 (4th Cir. 1967) (*Blackwelder II*).

3. Judge Kellam subsequently ruled that the deposit should be returned to Holladay. *Sterling v. Blackwelder,* 302 F.Supp. 1125 (E.D.Va. 1968). We affirmed on appeal, both as to John Sterling: *Sterling v. Blackwelder,* 414 F.2d 1362 (4th Cir. 1969); and Blackwelder: *Sterling v. Blackwelder,* No. 12,921 (4th Cir. Jan. 9, 1970) (*Blackwelder III*) (unreported).

turn of the deposit, noted the charges leveled against a member of the bar, and remanded to Judge Lewis with directions to conduct an "inquiry . . . to protect [the district court's] own integrity." [4]

The net result of that inquiry—which has its own history [5]—was that certain questions regarding the rights of the various parties (in C.A. No. 3207) to the proceeds of Moorefield's sale were referred to Judge Hoffman. Of those, only one is relevant here: John Sterling's claim to one-half of David Sterling's share, opposed by the latter on the grounds that the February 1964 assignment was fraudulently procured and that its admission into evidence pursuant to the 1966 judgment was a fraud on the court. Blackwelder subsequently filed, in March 1972, a motion [6] under Rule 60(b), Fed.R.Civ.P., aligning himself with David Sterling's claim that the original assignment was fraudulent and requesting that the 1966 judgment be set aside. He also prayed that the instant defendants, as well as DeLuca and American

Realty Trust, be joined as adverse parties, in order to pursue a damage award from the former and reconveyance of Moorefield to him from the latter. Denying relief, Judge Hoffman made several rulings: (1) he denied, without prejudice, that part of Blackwelder's motion seeking to expand No. 3207 to include damage claims against the instant defendants; [7] (2) Millman was provisionally ordered to be made a defendant; (3) the claim that the 1966 judgment should be set aside on the basis of fraud—pressed by David Sterling and Blackwelder—was rejected, and John Sterling's one-quarter share in the proceeds by virtue of that judgment was reaffirmed; [8] (4) to the extent that Blackwelder's motion sought to overturn the 1968 sale on the basis of fraud on the court, i. e., Millman's role as "undisclosed purchaser," relief was denied because Moorefield had since been sold and resold and the "fair and reasonable price" received under the circumstances "did not cause a 'manifestly unconscionable' result as would be required [to find] fraud on the court;" [9] (5) the prior order making Millman a defendant was rescinded.[10]

4. *Blackwelder III,* n. 3 *supra,* Slip Opin. at 4.

5. The response initially requested by this court from Millman was filed in the form of a "Reply Memorandum on Behalf of John R. W. Sterling" and consisted simply of a general denial of wrongdoing on Millman's part. Unable to resolve the question, we directed Judge Lewis to conduct an inquiry. Concerned that the charges might be wholly false and that publication of such accusations might unjustifiably harm Millman, we instructed the Clerk to withhold publication of our opinion in No. 12,921, filed January 9, 1970 (*Blackwelder III*).

In May 1970, Dworman was deposed, in which by various responses he took the position that Millman was simply his attorney and that Paris was a dummy corporation innocently made available by Millman for the convenience of holding title to Moorefield temporarily. Shortly thereafter, at the hearing before Judge Lewis, Millman refused to testify when called as an adverse witness by Blackwelder and declined to be his own witness in response to the testimony and exhibits presented by Blackwelder. Millman was then suspended from further appearance as an attorney in the United States District Court for the Eastern District of Virginia pending the court's final

report. Judge Lewis' December 1970 report to this court substantiated most of the charges now repeated in the instant suit, but on Millman's appeal we deemed it nonadjudicatory, noting that Judge Lewis' conclusion was only that further proceedings should be considered. Dismissing the appeal as moot, we stated:

If the facts as uncovered by the district judge are true, we have no doubt of the impropriety and illegality of [Millman's] conduct. We are in agreement, therefore, with the conclusions of the district judge that consideration should be given to the institution of disciplinary action against Mr. Millman and of further proceedings to recover any unjust enrichment that Mr. Millman may have realized.

In re Millman, 439 F.2d 412, 416 (4th Cir. 1971).

6. It was titled "Motion for Relief from Prior Judgments and for Further Relief."

7. *Sterling v. Blackwelder,* C.A. No. 3207, Mem. Opin. (E.D.Va. May 31, 1972).

8. *Id.,* Judgment (Nov. 7, 1973).

9. *Id.,* Mem. Opin. (Sept. 28, 1973), at 5.

10. *Id.,* Judgment (Nov. 7, 1973).

This court affirmed,[11] holding that as a matter of equity the lower court had not abused its discretion in refusing to overturn the sale.

## II.

After he had been denied (without prejudice) the opportunity to enlarge the proceeding before Judge Hoffman, in March 1972, by order entered May 1972, and after Judge Hoffman had in September 1973 ruled against overturning the sale, Blackwelder filed the instant action on November 2, 1973.[12]

### The Complaint

Blackwelder charged that Millman, his wife,[13] Dworman (and Dworman Building Corporation), Paris, Charles Bresler, a real estate broker, and Continental Mortgage Investors (CMI),[14] had entered into a conspiracy to defraud him out of his ownership rights in and fair market value of Moorefield, all for their own personal gain. The agreement, it is alleged, was carried out by the following overt acts: (1) prior to the sale, Dworman requested a loan commitment from CMI for the purpose of purchasing Moorefield, agreeing to lend the credit and assets of his corporation as security; (2) the defendants secured an appraisal of Moorefield, which valued it at $1,625,-000; (3) CMI then made a loan commitment of $900,000, and further agreed to become a financing principal with Millman, Dworman, and Bresler, in exchange for 20 percent of the net profits accruing upon resale of Moorefield; (4) Dworman, Millman, and Bresler at the same time agreed to split equally the remaining 80 percent of the net profits accruing upon resale; (5) Dworman, having agreed to conceal the profit-sharing plan from Blackwelder and the court, successfully bid Moorefield in at $730,000 on March 29, 1968; (6) Millman, acting as attorney for John Sterling, successfully urged Judge Lewis to accept the bid as reasonable and representative of fair market value under the circumstances, without disclosing his relationship with Dworman or his role as potential profit-sharer; (7) Dworman thereafter assigned his bid to Paris, of which Millman was president, and Paris, then the recorded owner, in turn mortgaged Moorefield to CMI to secure the latter's loan of $700,000 (recorded April 30, 1968); (8) in January 1969 Millman, again without disclosure, urged this court to affirm Judge Lewis' finding that the price was reasonable; (9) in late July 1969 Millman, as president of Paris, deeded Moorefield to DeLuca Enterprises for $1,350,000, DeLuca thereafter placing a mortgage on Moorefield for $1,800,000; (10) CMI, Dworman, Millman, and Bresler then divided up their respective shares of the $620,000 profits. Blackwelder prayed for $2,070,-000 compensatory damages (with interest from July 29, 1969) and $10,000,000 punitive damages.[15]

### Millman's Motion

Millman moved to dismiss the complaint or alternatively for summary judgment claiming that (1) Blackwelder's complaint sought to adjudicate that which was barred by res judicata and collateral estoppel; (2) an action of this nature was barred by Virginia's one-year

11. The appeal, No. 74–1067, from Judge Hoffman's November 7 judgment, which incorporated his September 28 findings, was consolidated with Nos. 72–1137, 72–1138, and 72–1974. We also reached the merits in 72–1138, an appeal from certain aspects of Judge Lewis' accounting, as ordered in *Blackwelder I*, and affirmed. *Sterling v. Blackwelder*, Nos. 72–1137, 72–1138, 72–1974, 74–1067 (4th Cir. Nov. 22, 1974) (*Blackwelder V*).

12. We note that the citizenship of all defendants is of a state other than Virginia, where Blackwelder resides. Thus complete diversity is present, and the action is properly in federal court under 28 U.S.C. § 1332(a).

13. Sondra Millman has made no appearances below or in this court. A default judgment has been entered against her, from which no appeal has been taken. Millman represents that they no longer are married.

14. A Massachusetts business trust that acted through its local agent, Guaranty Bank.

15. Malice was alleged throughout the complaint.

statute of limitations; (3) service of process was defective. Judge Bryan denied the motion in all respects, ruling first that language in Judge Hoffman's May 1972 order denying Blackwelder's motion to enlarge clearly indicated that the conspiracy-to-defraud allegations against defendants here raised questions different than those presented in the equitable proceeding seeking to overturn the sale to Dworman. Secondly, he held Virginia's five-year limitations period applied to Blackwelder's claim because under Virginia law it was survivable and alleged direct injury to his interest in Moorefield.[16] The court noted that Millman had not contended that the action was barred under the five-year limitation period.

*CMI's Motion*

CMI then moved to dismiss or for summary judgment, claiming that the one-year period applied to bar the action or, alternatively, that the action was barred under the five-year period because Blackwelder's prior statements, together with what was public record concerning the Dworman transaction, showed conclusively that Blackwelder had discovered, or with due diligence ought to have discovered, his cause of action prior to November 5, 1968, in excess of five years before the filing of suit on November 5, 1973. Thus, it was argued, any attempt by Blackwelder to toll the statute by showing fraudulent acts of concealment attendant to and subsequent to the March 1968 sale must necessarily fail.

Replying to CMI's documentary submissions, as well as responsive affidavits submitted by Blackwelder and his attorney in 1968, Alfred Hiss, Judge Bryan agreed, finding no "genuine issue as to the material fact as to when this fraud was discovered or by the exercise of due diligence ought to have been discovered."[17] Viewing the alleged fraud as discovered or, by due diligence, discoverable as early as August 1968, summary judgment on the limitations defense was granted in favor of the defendants.[18]

### III.

Blackwelder appealed from the order granting summary judgment on the basis of the five-year limitations period. At oral argument, counsel for Millman reiterated the statement in his brief that for purposes of this appeal only, Millman accepted the lower court's ruling that the five-year period was applicable, suggesting that in the event we agreed with Blackwelder and reversed for a trial, the question of the applicability of the one-year period would be preserved for a later appeal. Disapproving, we directed defendants to file supplemental briefs directed to the one-year limitations period or be barred henceforth from raising same. Millman's supplemental brief, in addition to that question, argues at length that dismissal would have been predicated on the res judicata and collateral estoppel grounds previously rejected in his motion below. Blackwelder's supplemental brief asserts that this latter claim is not before us since a cross-appeal was not taken nor did this court allow or direct supplemental briefs on this question.

■ We think the better rule is that a cross-appeal by defendants was unnecessary: since Blackwelder's claim was totally rejected as time-barred, Millman, without cross-appeal, "may support the judgment by urging any theory, argument, or contention which is supported by the record, even though it was specifically rejected by the lower court." 9 J. Moore, *Federal Practice* § 204.11[3], at 938 (2d ed. 1953); *see Cook v. Hirschberg,* 258 F.2d 56, 57 (2d Cir. 1958).

16. The service of process claim has not been raised on appeal, and we deem it settled in Blackwelder's favor.

17. *Blackwelder v. Millman,* C.A. No. 489–73–A, Mem.Opin. (E.D.Va. May 10, 1974).

18. Excepted therefrom were Sondra Millman and Paris, in whose names no responsive pleadings were filed. Default judgment was entered against these two defendants. This appeal raises no question with respect to them.

*Contra, Tallman v. Udall,* 116 U.S.App. D.C. 379, 324 F.2d 411, 417–18 (1963), *rev'd on other grounds,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

■ On the other hand, the rule is intended to preserve judicial resources, not to waste them. If the lower court's judgment terminating the lawsuit is sustainable on alternate grounds explicitly but erroneously rejected below, it serves no end to "reserve" the questions for a later appeal, and we decline to do so.

## IV.

■ Reaching those alternate grounds, however, we think the district court was correct. In his claim of res judicata or collateral estoppel, Millman argues that, with evidence of his profit-sharing role before Judge Hoffman, his decision not to overturn the sale on the basis of fraud on the court necessarily resulted in Millman's exoneration. Our examination of that proceeding, together with our opinion affirming, leads us to conclude otherwise.

At the March 9, 1972, hearing on Blackwelder's motion filed the previous day, counsel for Millman expressed concern over the upcoming April hearing on the merits—whether its scope would be broadened to include "the allegations of fraud made against Mr. Millman with respect to the judicial sale and the chilling aspect . . . ."[19] Having already (orally) rejected Blackwelder's attempt to join and seek damages from the instant defendants, Judge Hoffman stated: "Unless I conclude that P. David Sterling and Leroy J. Blackwelder can now upset that sale, there is no necessity to get into that."[20] The reference to "upset the sale" clearly went to whether the movants could make the necessary showing under Rule 60(b) that was required for proving fraud on the court. As for

Millman's status, Judge Hoffman was then "of the opinion that he should be left in [as a defendant] for the moment, at least."[21] In his order of May 31, 1972, Judge Hoffman reiterated his denial of that part of the motion seeking to enlarge, stating that it was "without prejudice to the right of Leroy J. Blackwelder to proceed in an independent action in a court of competent jurisdiction."[22]

His final opinion and judgment with respect to the 1968 sale were consistent with his earlier limitation of the issues. In his September 1973 opinion, before turning to his discussion of whether the 1966 judgment could be overturned on the basis of the allegedly fraudulent assignment, he noted that the "branch of the case" involving Millman's role as an "'undisclosed purchaser' . . . is relevant in the present proceeding only insofar as it has possible evidentiary value in relation to the alleged fraud committed by Millman" in procuring the challenged assignment.[23] Footnoted to that statement, in relevant part, was the following:

Regardless, however, of whether Millman's actions were proper or not, his possible misconduct would not permit an overturn of the sale on the basis of fraud on the court. Aside from the fact that the property has been sold and resold, the evidence supports the conclusion that the price received for Moorefield farm was a fair and reasonable price under all the circumstances, which included a real reluctance to bid on the part of prospective buyers for fear of becoming involved in litigation. Certainly the price received did not cause a "manifestly unconscionable" result as would be required for fraud on the court. See the later discussion of fraud on the court.[24]

**19.** Transcript of Hearing, *Sterling v. Blackwelder,* C.A. No. 3207 (E.D.Va. Mar. 9, 1973), at 83.

**20.** *Id.*

**21.** *Id.,* at 75.

**22.** *Sterling v. Blackwelder,* C.A. No. 3207, Mem.Order (E.D.Va. May 31, 1972), at 7.

**23.** *Id.,* Mem.Opin. (Sept. 28, 1973), at 5.

**24.** *Id.,* at 5, n.7.

That "later discussion" analyzed and rejected, for various reasons, David Sterling's claim that the 1966 judgment should be set aside.[25] As for Blackwelder's motion under Rule 60(b), it was denied as resting "on the same grounds as [the motion] of P. David Sterling concerning the validity of the assignment with the additional ground of newly discovered evidence. The ground of newly discovered evidence is subject to a one year time limit. F.R.Civ.P. Rule 60(b)(2)."[26]

What the foregoing shows quite clearly, we think, is that that portion of Blackwelder's motion seeking to enlarge C.A. No. 3207 into a suit for damages against the instant defendants was separated out from the beginning, whereas the portion seeking under Rule 60(b) to *overturn* the 1968 sale on the basis of fraud on the court was denied because the rather strict showing in equity of a "manifestly unconscionable" result was lacking, for the reasons stated in the district court's footnote 7, quoted *supra,* as elaborated upon in the subsequent textual discussion of David Sterling's claim. That equitable relief under Rule 60(b) on the basis of fraud on the court is predicated upon a qualitatively and quantitatively higher standard of proof than is necessary in the instant action was recognized in our opinion affirming Judge Hoffman:

> With regard to the district court's declining to set aside the judicial sale of Moorefield Farm, we think the complete answer to Blackwelder's contention is that the district court's finding that "the evidence supports the conclusion that the price received for Moore-

field Farm was a fair and reasonable price" is not clearly erroneous. Hence, *as an equitable matter,* the district court did not exceed its discretion in concluding that equity would not be served in overturning the sale. Of course, *we express no view* as to whether the attorney should or should not be entitled to retain any profit from the resale of the property should that question be raised in other litigation.

*Blackwelder V,* n.11 *supra,* Slip Opin. at 4–5 (emphasis added). Since retention of profits is precisely the issue here, Millman's claim that he was exonerated in that proceeding cannot be reconciled with the *caveat* quoted above. We therefore hold that nothing that was adjudicated in C.A. No. 3207 by Judge Hoffman, as affirmed, acts by way of res judicata or collateral estoppel to bar the instant complaint—or proof presented thereunder—against Millman and the other defendants.

 As to the claim that Blackwelder had only one year under Virginia law within which to bring his cause of action, we agree with the lower court's reading of the applicable statutes and case law. *Va.Code Ann.* § 8–24 (1957) specifies that where no limitations period is otherwise provided—which is the case with fraud and deceit—those personal actions which could have been brought by or against a personal representative, *i. e.,* actions which are survivable, can be brought within five years; if not survivable, a one-year period applies.[27] Survivable actions include those at law, for money damages, to compensate for "damage to any estate of [the] dece-

---

**25.** Judge Hoffman ruled: (1) to the extent that David Sterling alleged fraud as to him, he was time-barred under Rule 60(b)(3), Fed.R.Civ.P., no motion having been made within one year' after the 1966 judgment; (2) to the extent that he sought relief on the basis of fraud on the court, he was not time-barred under that rule, but was barred because the December 1966 judgment was affirmed in *Blackwelder I*; (3) but even as to the merits, neither was there sufficient evidence to rule the assignment invalid, nor could the 1966 judgment have been

"manifestly unconscionable" as to David Sterling, since by his own assertion he participated in the allegedly fraudulent assignment. Judge Hoffman found David's testimony regarding the fraud incredible.

**26.** *Id.,* at 17, n.13.

**27.** *Richmond Redevelopment & Housing Authority v. Laburnum Construction Co.,* 195 Va. 827, 80 S.E.2d 574, 578–79 (1954); *Newman v. Prior,* 518 F.2d 97 (4th Cir. 1975).

dent." *Va.Code Ann.* § 64.1–145 (1973). Where the wrong complained of resulted *directly* in damages to plaintiff's property rights, the action survives, whereas actions for wrongs purely personal in nature, *e. g.,* libel and slander, or wrongs which only indirectly cause damage to the estate do not.[28] Applying the foregoing to an antitrust complaint, in which the unlawful conspiracy was alleged to have resulted in damages to plaintiff's business, this court held that the damages to property were the direct result of the wrong; thus the action was survivable and governed by the five-year period. *Barnes Coal Corp. v. Retail Coal Merchants Ass'n,* 128 F.2d 645, 650–52 (4th Cir. 1942). Similarly, in *Worrie v. Boze,* 198 Va. 533, 95 S.E.2d 192 (1957), a conspiracy to induce breach of a contract not to compete, resulting in loss of plaintiff's customers, was held to have resulted in "wrong done and damage done . . . directed to the estate or property of the plaintiffs and not to them personally." *Id.,* 95 S.E.2d at 196. Here, if Blackwelder's allegations can be proved, the defendants' conspiracy had the direct purpose and effect, over the period of time stretching from the bidding by Dworman until the resale to DeLuca, of depriving him of potential business profits accruing from Moorefield's resale and taking those profits for themselves. Far from being a consequential injury to property flowing out of fraud directed at the person only, the injury here was a direct wrong to Blackwelder's property interest in Moorefield, and we so hold.[29]

## V.

The question framed by CMI's motion for summary judgment centered on the rule stated in *Stephens v. Abbott, Proctor & Paine,* 288 F.Supp. 836, 844 (E.D. Va.1968):

> In Virginia a cause of action of which the gravamen of same is fraud shall be deemed to accrue, both at law and equity, at the time such fraud is discovered, or by the exercise of due diligence ought to have been discovered.

CMI asserted that (1) the cause of action in fact accrued in April 1968 when the district court confirmed the sale to Dworman and title passed to Paris, more than five years prior to the November 1973 complaint; and (2) Blackwelder's own statements to the courts during that seven-month period (April–November), together with what was then public record, showed that he had discovered or should have discovered the fraud by November 1968.

The district court's order of May 10, 1974, made no finding as to when the cause of action actually accrued. Instead, the district court concentrated on the question of discovery of fraud and held that the fraud "*was* discovered, and certainly by the exercise of due diligence ought to have been discovered, at least as early as August of 1968 . . . .." (original emphasis.) Implicit in such a finding and conclusion is the unstated assumption that the cause of action actually accrued sometime prior to August 1968. We disagree, and for reasons sub-

---

28. *Carva Food Corp. v. Dawley,* 202 Va. 543, 118 S.E.2d 664, 666–67 (1961); *Richmond Redevelopment & Housing Authority v. Laburnum Construction Co., supra; Winston v. Gordon,* 115 Va. 899, 80 S.E. 756, 762–63 (1914); *see also Newman v. Prior, supra.*

29. *See Cover v. Critcher,* 143 Va. 357, 130 S.E. 238, 240 (1925). *Carva Food, supra,* and *Richmond Redevelopment, supra,* cited by defendants, are not to the contrary. In *Carva Food,* it was charged that the defendant fraudulently failed to secure insurance for property subsequently damaged by a windstorm. The uninsured loss was held to have resulted only indirectly from the alleged fraud on the plaintiff. In *Richmond Redevelopment,* fraud occurring in the installation of a gas pipe was found to have only indirectly resulted in damage flowing from an explosion allegedly due to a defective installation. In both cases the one-year period was held applicable because the damage to the property arose out of intervening events over which the defendants had no control; the plaintiffs' *losses* attendant thereto were compensable, if at all, only because they might have been avoided had the defendants not deceived them. Here, as the lower court pointed out, the events and actions bringing about the damage to Blackwelder's interest were allegedly manipulated and consummated solely by the defendants.

sequently stated, conclude that the cause of action accrued upon events occurring in 1969, well within the five-year permissive period of the statute. Since the action was therefore timely brought after accrual it is unnecessary to consider the mitigating rule of *Stephens* which has the effect of extending the period of prosecution by allowing the additional time within which the fraud was undiscovered or by due diligence undiscoverable.

■■ It is hornbook law that in cases of civil, as opposed to criminal, conspiracy, the agreement itself does not create liability at law, though it obviously serves to broaden the range of parties answerable for damages suffered:

> [I]t is not essential to criminal liability for conspiracy that the object of the conspiracy should have been accomplished. Civil liability rests on different grounds, however, and, unless actual damage has resulted from something done by one or more of the conspirators in furtherance of the object of the conspiracy, no civil action lies against anyone; but, if a conspiracy is conceived and executed, and a private injury results, the one so injured has a right of action against the conspirators.

15A C.J.S. *Conspiracy* § 6 (1967), *applied in Gallop v. Sharp,* 179 Va. 335, 19 S.E.2d 84, 86 (1942); *see* W. Prosser, *The Law of Torts* § 43, at 260 (Hornbook ed. 1964). The underlying tort as alleged here—defrauding Blackwelder out of his property interest in the profits from Moorefield—did not begin and end with the district court's confirmation of sale. Given the heated and ongoing dispute among the parties—especially between Millman and Blackwelder, assiduously documented by defendants—none of the alleged conspirators could seriously have believed that the confirmation would not be contested on appeal. It was thus necessary not only to convince Judge Lewis that the sale was fair and valid, but to argue for affirmance before this court. Millman—and it is undisputed—did just that in January 1969, disclosing neither his attorney-client relationship with Dworman nor his proprietary interest in `Moorefield's resale.[30] A favorable decision on appeal was not merely frosting on an already-consummated tort. Instead, given Millman's key role as attorney for appellee John Sterling, for whom he could urge affirmance of the sale while at the same time not disclosing his own personal interest therein, this allegedly deceitful use of the judicial process was itself a central and necessary act in furtherance of the agreement. This court's refusal to overturn the sale (by way of dismissing the appeal as moot) converted the profit-sharing plan from a contingency to a virtual certainty: Paris, short of a successful petition for certiorari (a slim chance indeed in this run-of-the-mine diversity case), then had title to Moorefield free of Blackwelder and his litigious reputation.

The preconditions for subsequent resale at fair market value thus established, Paris sold Moorefield to DeLuca for $1.35 million; the distribution there-

---

**30.** We also note that his profit-sharing interest is no longer a question of *allegation.* Millman, by affidavit incorporating his "Statement of Material Facts as to which There Is No Genuine Issue," R. 81, 86, stated that at the time of the conveyance of Moorefield to Paris he had a one-third "equitable interest" in the property, and that he did not disclose this fact to the lower court. Responding to interrogatories, he also stated that while he and Dworman had no written or oral agreement to "work together to purchase Moorefield Farms for and in behalf [of themselves] and/or Paris Properties, Inc. or others" (Inter. 22(e)), his one-third interest in the profits was promised in consideration for CMI's requirement that he sign (as guarantor) the promissory note (Inter. 22(g)); that after Moorefield was resold by Paris, the "remaining 80% net after CMI and Guaranty Bank had acquired their share was to be divided in one-third interests" among Dworman, Bresler and his partner Burton Reiner jointly, and Millman (Inter. 22(h)); and that CMI's 20 percent share was itself secured by written agreement with Millman and Dworman (Inter. 25(d)). The latter agreement appears in the record and is dated April 5, 1968.

after of some $600,000 in profits was the final act consummating the alleged fraud.

 The cause of action, then, could not have accrued before November 1968 because (1) that portion of the alleged conspiracy aimed at securing marketable title to Moorefield was as yet unfulfilled—the appeal had not yet been heard; and (2) the *actionable* damages as alleged here did not *exist* in any substantial or ascertainable degree until the land was resold *at a profit* and the profits distributed among persons who, such as Millman, allegedly should not have received them.[31] As stated by the Supreme Court of Appeals of Virginia:

> The gist of the civil action of conspiracy is the damage caused by the acts committed in pursuance of the formed conspiracy and not the mere combination of two or more persons to accomplish an unlawful purpose or use unlawful means. In other words, the basis of the action is the wrong which is done under the conspiracy and which results in damage to the plaintiff. *No cause of action exists without the resulting injury, and the damage produced must arise as the effective result of the conspiracy.*

*Gallop v. Sharp, supra,* 19 S.E.2d at 86 (emphasis added). Thus, even on the assumption that Blackwelder prior to November 1973 had full knowledge of the alleged conspiracy and its then-executed part (the April 1968 sale), the most he could have alleged was that according to the *agreement* Millman *intended* to use his position as attorney to secure the desired affirmance without disclosure, and the defendants *intended* to resell Moorefield at a profit and distribute same. But since these events *then* were mere contingencies, we think a court applying *Gallop* would have dismissed the instant claim for damages as not actionable or, at best, premature. Blackwelder, to be sure, at that time might have stated a good cause of action in equity to *overturn* the sale, but, as we have chronicled, that which he later asserted in equity under Rule 60(b) proved unsuccessful [32] and is not in issue here.

---

**31.** While there is some difficulty in discerning a clear rule on when the limitations period begins to run in civil conspiracy cases, *see* 16 Am.Jur.2d *Conspiracy* § 60 (1964); 15A C.J.S. *Conspiracy* § 22 (1967), we think it established at the very least that the overt act actually causing the damage is the important event. *See, e. g., Bergschneider v. Denver,* 446 F.2d 569 (9th Cir. 1971); *Peto v. Madison Square Garden Corp.,* 384 F.2d 682, 683 (2d Cir. 1967), *cert. denied,* 390 U.S. 989, 88 S.Ct. 1185, 19 L.Ed.2d 1293 (1968); *Suckow Borax Mines Consolidated, Inc. v. Borax Consolidated, Ltd.,* 185 F.2d 196 (9th Cir. 1950), *cert. denied,* 340 U.S. 943, 71 S.Ct. 506, 95 L.Ed. 680 (1951); *Northern Kentucky Telephone Co. v. Southern Bell Tel. & Tel. Co.,* 73 F.2d 333, 335 (6th Cir. 1934), *cert. denied,* 294 U.S. 719, 55 S.Ct. 546, 79 L.Ed. 1251 (1935); Note, *Developments in the Law—Statutes of Limitations,* 63 Harv.L. Rev. 1177, 1206 (1950). Difficulty arises when the actual damage flowing from a single overt act continues or accrues over time, *see Steiner v. 20th Century-Fox Film Corp.,* 232 F.2d 190, 194–95 (9th Cir. 1956), or when the tortious conspiracy continues but the damages are already complete and fully ascertainable, *see Momand v. Universal Film Exchanges,* 172 F.2d 37, 49 (1st Cir. 1948), *cert. denied,* 336 U.S. 967, 69 S.Ct. 939, 93 L.Ed. 1118 (1949). *See also* 54 C.J.S. *Limitations of Actions* § 169 (1948); *Developments, supra,* at 1200–07. In neither case can later overt acts be used as a starting point, for then no limitation period would apply until the damages ceased or the conspiracy ended, if ever. But the instant case, a conspiracy to defraud, is quite different: here were multiple overt acts the combined and cumulative effect of which was to obtain marketable title free and clear of the chilling effect of pending litigation, thus enabling resale shortly thereafter at a greatly enhanced price as compared with the prior confirmed court sale. The capacity of conspirators to create ingenious schemes to defraud must be met with limitations rules designed not to encourage but to hinder them. This is especially true where, as here, the alleged fraud involves and depends upon the judicial process, a necessarily time-consuming tort. *See Winkler-Koch Engineering Co. v. Universal Oil Products Co.,* 96 F.Supp. 1014, 1018 (S.D.N.Y.1950); 100 F.Supp. 15, 29 (S.D.N.Y. 1951). We have every reason to believe that the Virginia courts would take a similarly sensitive view of this type of conspiracy to defraud.

**32.** In that regard, we disagree with Millman's implication that our refusal to apply the statute of limitations in this case would strip its policy of repose of "continued meaning and vitality." Millman Supp. Brief at 35. That

Since we find on the basis of undisputed facts that Blackwelder's cause of action did not accrue until defendants completed their alleged conspiracy, by actions occurring well within the limitations period, summary judgment based on an application of the rule in *Stephens, supra,* was erroneous. We hold that Blackwelder's cause of action is as a matter of Virginia law not time-barred.

Accordingly, the judgment of the district court is reversed and the case remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

Blackwelder's claim was not filed until November 1973 is, given the history of this litigation, certainly not attributable to a want of diligence on his part in asserting it. He was prepared to litigate as of March 1972, and the delay from May 1972 (Judge Hoffman's refusal to enlarge) to November 1973 is evidently attributable to Blackwelder's awaiting Judge Hoffman's decision on whether the 1968 sale would be overturned, which he effectively handed down in September 1973. Nor, for the same reasons, can the defendants claim that they suffered the kind of prejudice that the statute is designed to avoid by insuring timely notice of a claim: a false sense of security. Blackwelder over the past several years "told . . . everyone who would listen" that he could prove the facts alleged in the instant complaint. Millman Supp. Brief at 28. We do not think we have strained or destroyed the policy behind the statute of limitations, and we do not perceive any harsh result in giving Blackwelder his day in court.