In the Matter of 1616 REMINC LIMITED PARTNERSHIP, Debtor.

1616 REMINC LIMITED PARTNERSHIP, Plaintiff,

v.

ATCHISON & KELLER COMPANY, a Joint Venture comprised of Atchison & Keller, Incorporated, Roland E. Kinser, an individual, and Tony Yaksh, an individual,

and

Atchison & Keller, Incorporated, a District of Columbia corporation, as a Member and Participant of the Joint Venture trading as Atchison & Keller Company,

and

Roland E. Kinser, as a Member and Participant of a Joint Venture trading as Atchison & Keller Company,

and

Tony Yaksh, as a Member and Participant of a Joint Venture trading as Atchison & Keller Company,

and

Peerless Insurance Company, a New Hampshire Corporation, Defendants.

Bankruptcy No. 75–659–A.

United States Bankruptcy Court, E. D. Virginia, Alexandria Division.

Oct. 7, 1981.

James A. Newell, Arlington, Va., for debtor.

Mark P. Friedlander, Jr., Friedlander, Friedlander & Brooks, Arlington, Va., for Atchison & Keller, Inc. and Roland E. Kinser.

Bernard E. Goodman, Vienna, Va., for Tony Yaksh.

Robert C. Coleburn, Arlington, Va., for Peerless Ins. Co.

## MEMORANDUM OPINION

MARTIN V. B. BOSTETTER, Jr., Bankruptcy Judge.

This matter came on for trial on the Demand for Affirmative Relief by 1616 Reminc Limited Partnership ("Reminc") against Atchison & Keller Company ("Atchison & Keller"), Atchison & Keller, Inc., Roland Kinser, Tony Yaksh and Peerless Insurance Company ("Peerless"). At the conclusion of Reminc's case, after three days of trial, the Court granted the defendants' Motion for Directed Verdict. On appeal, the district court remanded the matter to this Court for the taking of additional evidence. The Court permitted the plaintiff, in its discretion, to reopen its case and heard evidence given by the defendants.

Reminc, a Virginia limited partnership, is a debtor-in-possession in a Chapter XII proceeding under the Bankruptcy Act presently before this Court. The partnership's principal asset is an office building located at 1616 North Fort Myer Drive, Arlington, Virginia, which is commonly referred to as the "Xerox Building". Atchison & Keller is a joint venture comprised of Atchison & Keller, Inc., Ronald E. Kinser and Tony Yaksh.

On July 11, 1973, Atchison & Keller entered into a subcontract with CITCON Corporation, the general contractor with whom Reminc had contracted for the construction of the Xerox Building to perform the mechanical work on the Xerox Building, including the fabrication and installation of a heating, ventilating and air conditioning system ("HVAC"). This work was to be in accordance with the contract plans drawn up by the architect (Robert Calhoun Smith) and the project engineer (Syska & Hennessy). In connection with this contractual obligation, Atchison & Keller entered into a performance and payment bond with Peerless in the amount of $1,345,000.00 to indemnify against loss or damage directly arising by reason of its failure to faithfully perform the subcontract.

Pursuant to its subcontract with CITCON, Atchison & Keller further subcontracted with various contractors and suppliers in order to meet its obligations, including Mitco Corporation which supplied Atchison & Keller with a variable air volume valve assembly and electric reheat units manufactured by ITE Corporation. Included in the installation of the HVAC system were 836 of the ITE electric reheat units. An occupancy permit was thereafter issued to Reminc on December 2, 1974 authorizing that a portion of the Xerox Building could be occupied by tenants. It appears, however, that the Xerox Corporation ("Xerox") became a tenant of the building prior thereto in August of 1974, and occupied 180,000 square feet of space out of a total of 290,000 square feet.

The building, to the apparent dissatisfaction of Xerox, suffered from numerous con-

struction defects. These defects included leakage problems, elevator deficiencies and control problems with the HVAC system. Xerox, the principal tenant, complained of a lack of adequate air conditioning and a lack of heat as the seasons changed during the winter of 1974–1975.

The subcontract in question specified that Atchison & Keller supply and install a Variable Air Volume Valve Assembly or "VAV" unit. Included in the VAV unit is a "Mitco" mixer valve, sound insulation lining, adjusting controls and an ITE electric reheat unit.

The VAV unit was designed by Mitco Corporation, one of four designated suppliers approved by the architect and project engineer. The Mitco mixer valve and ITE reheat unit were supplied by Mitco as part of the VAV unit. Design and shop drawings for these units were submitted to the architect and project engineer for their inspection, review and approval prior to the manufacture and installation of the VAV units.

A central air shaft, not constructed by Atchison & Keller, was to deliver air to the appropriate floor of the building where it would flow through a sheet-metal ductwork system. The air passed through the VAV unit to be either heated or cooled prior to entering individual rooms through floor or ceiling diffusers. The record shows that the air shaft was improperly constructed creating a lack of sufficient air flow. The record reveals also that if insufficient air passed through the VAV unit (i. e., the air pressure was low in the central shaft) the diffusion process could be disturbed to the extent of causing the air in the system to "dump". This dumping effect, caused by poor air distribution over the heating elements (reheat coils) of the reheat units, resulted in hot spots developing on the coils.

To prevent irreparable damage, the ITE reheat units were equipped with two principal safety devices that would cut off the reheat coils—automatic reset and manual reset. The automatic reset consisted of a tube strung across the face of the reheat coils in the center of the air flow. The manual reset consisted of a small surface-mounted disc located in a corner of the unit.

The record indicated that the ITE reheat unit, once shut off under the automatic reset, would return to service on its own after the unit had cooled down sufficiently. This, apparently, did not occur if the manual reset was triggered first, however. In this instance, maintenance personnel would have to physically reset the unit in order to bring it back into service.

Early efforts undertaken to resolve this problem were unsuccessful thereby necessitating the institution of remedial work. Included in this remedial work was the replacement of the 836 ITE reheat units.

Reminc asserts its claims in its own right and as assignee of CITCON on the subcontract, the joint venture agreement and the performance bond.

The Court first addresses the issue raised by Reminc under the Dual Obligee Performance and Payment Bond regarding the liability of Peerless, as surety, if any, under this bond.

Peerless relies upon two express conditions precedent to which all parties under the bond affixed their signatures and accepted. Paragraph Three states:

"3. That the obligees [Reminc] or any of them, shall notify the Surety by registered letter, addressed and mailed to it at its Home Office, of any breach of said contract within ninety (90) days after such breach shall have come to the knowledge of the Obligees or any of them, or the Architect [Robert Calhoun Smith] or Engineer [Syska & Hennessy]."

Peerless acknowledges that Reminc is in compliance with the requirement that it allege performance of conditions precedent, Fed.R.Civ.Proc. 9(c), but that it has failed to prove performance. The assertion is made by Peerless that Reminc failed to notify it either within the period prescribed in paragraph three or in the prescribed manner although Reminc had knowledge of an alleged breach.

A review of the record reveals that Reminc was made aware of major problems

with the HVAC system in late 1974 and early 1975. For instance, Theodore B. Gould, the General Partner for Reminc, identified a letter from CITCON to Ranger Construction Company[1] which placed Ranger on notice that Atchison & Keller had not completed the mechanical system in accordance with the plans and specifications and which also required the institution of remedial repairs. Gould acknowledged that Reminc was in receipt of a carbon copy of this letter and, in fact, the letter was admitted into evidence as Plaintiff's Exhibit 67.

A memorandum addressed to Robert E. Morrison (then a general partner of Reminc) from Bill Robinson (an employee of Reminc), dated December 3, 1974 (and admitted into evidence as Plaintiff's Exhibit 19) states in part that "[i]t is S & H's [Syska & Hennessy] opinion that the HVAC system is being plagued by numerous problems that added together makes one big problem." Further, a letter dated December 30, 1974 addressed to Robert Morrison from Syska & Hennessy (and admitted into evidence as Plaintiff's Exhibit 35) states:

"Based on our review of the letter it is again necessary to reiterate that there is nothing wrong with the design of the system. The problems of the system, [sic] are a result of the installation. This of course is with the exception of return air shaft problems in the garage."

■ An examination of these and other letters and memoranda admitted into evidence establishes that quantum of notice contemplated under the bond. Even if we found that Reminc gave appropriate notice under the bond, it did not meet the express condition precedent set forth in paragraph five of the bond which states:

"5. All suits at law or proceedings in equity to recover on this bond must be instituted within twelve months after the completion of said contract, and in any event within twelve months from the date fixed in said contract for its completion."

■ The evidence, taken as a whole, indicated that Atchison & Keller essentially completed the work required of it under the subcontract between it and CITCON in August or September 1974. Therefore, the running of the one-year period provided for in paragraph five will be deemed to commence from September 1974.

Reminc argues that the one-year period stated under the bond is in reality a statute of limitation and that this period was effectively tolled from the time Reminc filed its initial petition under Chapter XI (August 1975) (later Chapter XII) to the confirmation of its Plan of Arrangement (May 1976). Reminc notes that in June of 1976 tests were conducted on the HVAC system and within two months thereafter suit was brought in the instant matter. Therefore, an action should be deemed to have commenced within the period contemplated under paragraph five.

■ The Court is not persuaded by this argument. The automatic stay provisions under Rules 11–44(a) and 12–43(a), Rules of Bankruptcy Procedure, relate clearly to actions commenced *against* the debtor not actions commenced by the debtor. The Court notes too that in Virginia a provision in a bond "which bars recovery from the surety after the expiration of one year following the date on which" the principal completed work on its contract is valid. Reminc has not established any valid ground for the Court to estop Peerless from relying upon the one-year limitation provision heretofore noted. 3A Michie's Jur., *Building Contracts*, § 22 (1976 Replacement).

1. There is conflicting evidence that notwithstanding a purported novation of Atchison & Keller's subcontract with CITCON to Ranger Construction, Atchison & Keller allegedly continued to treat Ranger as one of several subcontractors working on the HVAC system. This view, which is urged by Reminc, is contradicted by the defendants who maintain that the novation occurred in November 1974. The defendants acknowledged that there was no written contract to this effect (and no document was offered in support of this position) but assert that CITCON (with Reminc's knowledge) dealt thereafter with Ranger as the principal subcontractor on the HVAC system.

Accordingly, the Court is of the opinion that the suit instituted by Reminc against Peerless, as surety under the bond, is barred as not being timely instituted within the twelve-month period after completion of the contract specified under paragraph five of the bond.

The Court next turns to Reminc's claim for damages. Reminc alleges that the defendants were under an affirmative duty to select a reheating unit which would perform satisfactorily in relation to the HVAC system. Reminc adduced testimony that the remedial work on the HVAC system was necessitated by the defendants' failure to meet the specifications required under Atchison & Keller's subcontract with CIT-CON and, accordingly, the defendants should bear responsibility for the costs of the remedial HVAC program as damages.

■ The evidence in a suit for breach of a construction contract must not only establish the amount of damages resulting to the plaintiff from such a breach but also must establish "the specific provisions breached [and] *the facts* constituting *the* breach...." [Emphasis in original.] *Cantrell v. Woodhill Enterprises, Inc.*, 273 N.C. 490, 160 S.E.2d 476, 481 (1968).

With respect to remedial defects, the general rule is that the proper measure of damages is usually "based on the market price of completing or correcting the performance and this will generally be shown by the cost of getting the work done or completed by another person." 3A Michie's Jur., *Building Contracts, supra*, at § 30.

■ Reminc certainly need not establish the existence of damages with mathematical precision. Rather, evidence sufficient to prove damages need only be established to a reasonable certainty or a reasonable probability. Thus, facts in a particular case must be such as to allow a reasoned and well-informed estimate of the amount of damages or loss sustained. *Holz v. Coates Motor Co.*, 206 Va. 894, 147 S.E.2d 152 (1966); *see Stevens v. Abbott, Proctor and Paine*, 288 F.Supp. 836 (E.D.Va.1968).

Reminc elicited testimony from George Schoonover, an employee of Shefferman & Bigelson Company, a consulting engineering firm. Schoonover testified that he had observed field tests on the VAV units (including the ITE reheat units) conducted by Pierce Associates, Inc. as part of the remedial program on the HVAC system.

Schoonover identified Plaintiff's Exhibit 93 as invoices concerning preliminary investigative work in connection with the HVAC system prior to the commencement of the remedial program. The invoices were broken down into four distinct categories. One of these categories was described as work relating to the HVAC system. Reminc acknowledged that part of the amounts stated in the invoices was the result of work that was clearly not the responsibility of Atchison & Keller. As Schoonover was not able to subtract such work from the invoices, the objection raised by the defendants as to the admission of this exhibit was sustained. Reminc was later given an opportunity to raise this point on remand but, apparently, chose not to do so.

Henry J. Browne was called as a witness by Reminc. He is an architect with the firm of Griff, Wood, Browne, Eichman & Dalgliesh. Browne was employed by Reminc to undertake an engineering survey of the Xerox Building. A report compiled thereafter indicated the existence of several deficiencies in the HVAC system. Browne served in the capacity of the architect for the restoration of the Xerox Building. Browne identified Exhibit 96 as a time log he maintained for his work at the Xerox Building. This exhibit was admitted into evidence. A review of this exhibit reveals that Browne spent eighty-nine hours on the HVAC system, exclusive of travel time. Browne testified that his hourly work rate was fifty dollars ($50.00). He testified further that his time logged prior to October 6, 1976 (74 hours) was primarily investigatory in nature while the time logged after this date (14 hours) was related to supervisory remedial work.

Rodney Hilkert, an employee of the George Hyman Construction Company dur-

ing that company's remedial construction work at the Xerox Building, also was called as a witness by Reminc. As project manager, Hilkert coordinated the office and field operations for the remedial work. He testified that the Walter C. Doe Company performed the electrical work required to disconnect the ITE units and reconnect the replacement reheat units ("Warren" unit) in the HVAC system. Admitted into evidence was that portion of Plaintiff's Exhibit 90 which could be attributed by Hilkert to the replacement of the VAV reheat units. The invoice numbers and amounts so attributable were L5119 ($9,752.35), S2736 ($3,479.33), S2604 ($510.46), S1734 ($8,072.18), and S1726 ($4,218.62). Only invoice number S1726 was appended to Exhibit 90 in support of the amount so listed in the exhibit.

Hilkert identified Plaintiff's Exhibit 92 as the Hyman Company's "Application and Certificate for Payment" Number 9—"Revised Final Application". This application represented the final requisition for work completed on the remedial program. Hilkert testified that cost code 94066, located at page 3, represented work done on the HVAC system in the amount of $33,903.00. Of this amount, Hilkert testified that to the best of his recollection $15,000.00 was directly attributable to work completed by the Hyman Company on the VAV reheat units. There was no documentation offered by Reminc in support of this figure. The exhibit was admitted into evidence for the sole purpose of establishing that Reminc incurred the costs stated therein.

Russell O'Grady, another witness called by Reminc, was the project engineer for Pierce Associates, Inc. This firm was involved in the remedial construction program for the HVAC system under a subcontract with the George Hyman Company. It conducted the field tests on the VAV reheat units.

O'Grady identified Plaintiff's Exhibit 87 as a requisition for payment for the remedial work relating to the HVAC system. He testified that this included work on the central airshaft, the reworking of the VAV boxes, replacement of the ITE reheat units, general refurbishing of the duct work and the piping system, as well as the refurbishing of the automatic temperature control system.

O'Grady testified that once proper air pressure was restored to the system (after the air shaft had been repaired) the HVAC system components required balancing. The figures stated in Plaintiff's Exhibit 87 did not separate the cost of balancing due to replacing the ITE reheat units from that due to the remedial work on the air shaft. O'Grady acknowledged that as this was an ongoing process, he could not ascertain from Exhibit 87 the amount attributable to balancing due to replacing the ITE reheat units. O'Grady did note that as the VAV reheat units were in the exterior system (as opposed to the interior system which had no such units) the major portion of the rebalancing work was done on the exterior system. He testified that records were available to him which could provide the number of man hours undertaken to rebalance the exterior system.

On the basis of O'Grady's testimony, Plaintiff's Exhibit 87 was admitted into evidence as a document which he signed relating to remedial work undertaken on the HVAC system. O'Grady testified that he reviewed documents not in evidence and proceeded to give a breakdown of costs relating to such remedial work. He placed the cost of comfort balancing at $6,800.00; the installation of the replacement reheat units at $21,437.00; the cost of replacement reheat units at $110,000.00 and the cost of the automatic temperature control work associated with the VAV units at $42,000.00.

Of course, for the damages heretofore asserted by Reminc to be awarded by the Court, a finding must be made that Atchison & Keller did, in fact, breach its subcontract with CITCON. The Court, in ruling on the numerous objections by the defendants to testimony which Reminc elicited from witnesses regarding design and performance deficiencies in the HVAC system, clearly stated that unless Reminc could attribute the damages heretofore asserted by

it to the defendants (within the framework of its entire case), the documents admitted into evidence and testimony heard on this question would be of little probative value.

It is within this context that we determine whether Reminc has established that any of the remedial work at issue herein was necessitated by Atchison & Keller's failure to perform under the specifications stated in the original subcontract.

As noted above, George Schoonover testified that he observed field tests on the VAV units conducted by Pierce Associates, Inc. The purpose of these tests was to analyze the performance of the ITE reheat units that were installed in a test apparatus designed to simulate a VAV unit where air flow through the apparatus could be controlled at various pressure settings. Measurements of the air flow through the Mitco valve [2] were taken in relationship to different pressure settings.

Schoonover testified that based upon his analysis of the test results, the ITE reheat units had a temperature limit control problem inasmuch as the automatic limit control was set at a higher temperature than the manual limit control, thus causing the units to shut off on manual which necessitated an expenditure of time in physically resetting such units.

Schoonover, on direct examination, discounted the effect the remedial repair work in the air shaft may have had on the performance of the ITE reheat units. He testified that even with increased air pressure through the VAV units, the ITE reheat units would still shut off on manual, inasmuch as the temperature control settings remained an inherent problem with these units. On cross-examination, however, Schoonover did acknowledge that the defectively-designed air shaft did have a direct effect on at least some of the ITE reheat units. He also stated that the HVAC system, as originally installed, would not have functioned properly without the air shaft having been corrected.

Russell O'Grady testified that he participated in the tests referred to by Schoonover. The report analyzing data gathered from the tests was admitted into evidence as Plaintiff's Exhibit 83. He testified that some of the ITE reheat units functioned properly under test conditions while others did not. A review of Exhibit 83 reveals that no heater cycling (i. e., either automatic or manual shut off of the reheat coils) was observed in several of the tests where sufficient uniform air pressure was maintained in the test apparatus.

Henry Browne, as the architect for the restoration of the Xerox Building, reviewed the results of the tests conducted on the ITE reheat units and, after consultation with Syska & Hennessy (the original design engineers and consultants to Reminc), Schoonover and O'Grady, among others, determined that the ITE reheat units would have to be replaced. He concluded that the heating elements in the reheat units were not capable of performing as required.

Reminc had considerable difficulty in identifying and placing into evidence all of the original plans or any of the original specifications under which Atchison & Keller were to perform. O'Grady testified that he had not reviewed the plans and specifications under which Atchison & Keller were required to install the VAV units. Reminc also sought to elicit information from Browne & Schoonover regarding the proper identification of drawings for the HVAC system as well as establishing what was required of Atchison & Keller under its subcontract with CITCON. Although the Court sustained objections raised by the defendants as to this line of questioning, Reminc was given an opportunity on remand to reopen its case but, as to this question, chose to rely upon testimony previously heard.

The defendant, Roland Kinser, testified that the principal problem causing the ITE reheat units to malfunction was the leakage

2. The Mitco valve is an air throttling device on the VAV unit which regulates the amount of air passing through the unit. A thermostat oper-

ates the control on the Mitco valve to restrict air passage through it.

evident in the air shaft and through the skin of the building. The inability of the air shaft to maintain proper air pressure in the HVAC system caused the entire system to malfunction. Kinser did acknowledge that a uniform but low air pressure passing through the VAV unit could trigger the manual re-set thereby shutting off the unit.

Reminc referred Kinser to that portion of Plaintiff's Exhibit 1–A at page 15009–6, which described the reheat unit to be emplaced in the VAV unit. Asked whether these specifications permitted Atchison & Keller to select a reheat unit without regard to performance capability, he replied that the referenced specifications could not properly be considered "performance-type" specifications. He explained that a performance specification would only state that the building was to be provided with reheat units that would heat the buildings to a specified temperature without detailing the exact manner in which it was to be obtained. The specification in question, however, was quite specific in describing the particular unit to be used.

Kinser testified that the specifications under the original contract were completely complied with by Atchison & Keller. He noted too that the location of the manual and automatic reset controls on the ITE reheat units and their respective temperature settings were determined and approved by the Underwriters' Laboratories as required by the specifications.

The Court, having reviewed the lengthy record in this matter, is persuaded by the fact that although the ITE reheat unit apparently was not singled out in the original specifications, Atchison & Keller did procure the unit from one of the approved suppliers—Mitco. The Court notes, too, that Mitco supplied to Atchison & Keller the design and shop drawings of the ITE reheat units and the latter, in turn, submitted the same to CITCON. There is further evidence that Syska & Hennessy, as the design engineer, and Robert Calhoun Smith, as the architect, reviewed the submission of these specifications and, thereafter, notified Atchison & Keller of their approval of the ITE reheat unit as an acceptable component in the VAV unit. In addition, the record is void of any evidence that the ITE reheat units placed in the VAV units were different from the shop drawings tendered to Reminc's reviewing agents. Nor was Reminc able to effectively establish that the approval of the ITE reheat units was with reservation or qualification.

There is evidence that the cycling of the reheat unit, when the manual reset was activated, caused a maintenance problem. However, Reminc has not satisfactorily established that this problem resulted from Atchison & Keller's installation of the VAV units or that it installed the reheat units without regard to their performance capability. This latter criterion, in any event, should not be asserted against the defendants inasmuch as all relevant information regarding the ITE reheat unit was duly submitted in the proper review channels for approval or rejection.

As Schoonover candidly acknowledged, the malfunctions in the HVAC system were due to numerous causes. The collapse of the air shaft and its subsequent inability to maintain airtight integrity was certainly a principal cause. Indeed, O'Grady, whose responsibility it was to actually overhaul the HVAC system, testified that this was the system's major problem.

It must be stated also that the reheat unit used by Reminc (the Warren unit) to replace the ITE reheat unit was clearly superior to the latter unit. The Warren unit's heating elements were uniformly coiled and provided a wire surface far greater than the less-evenly coiled wire surface strung across the face of the ITE reheat unit. In addition, the Warren unit was derated by sixty percent. This allowed it to function even under little or no air flow conditions for an extended period of time (*i. e.*, when there was only *de minimus* air pressure in the system). The fact that the Warren unit exceeded the specifications of the ITE unit, when coupled with the much-improved air flow caused by relining the air shaft with sheet metal, clearly es-

tablishes that the remedial program resulted in an HVAC system superior to the one specified, approved and installed by Atchison & Keller in completing its work under the original subcontract with CITCON.

Based upon the foregoing, the Court concludes that Atchison & Keller completed the installation of the HVAC system in general and the ITE reheat units and Mitco valves in particular in a workmanlike manner[3], pursuant to its subcontract with CITCON. Therefore, the Court cannot render judgment in favor of Reminc for the cost of installing the Warren reheat units or for the cost of these units themselves. Nor can the Court grant judgment for the assessment of other costs as damages for remedial work undertaken by Reminc involving the HVAC system. Accordingly, the Court is of the opinion that Reminc's Demand for Relief be denied[4].

An appropriate Order will enter.

3. A contractor under a construction contract implies that his work will be done in a reasonably good and workmanlike manner. A contractor undertaking a project impliedly represents that he will exercise a degree of skill necessary to complete the job he had undertaken. *Mann v. Clowser*, 190 Va. 887, 59 S.E.2d 78 (1950). The standard which the law exacts for a contractor to meet this implied warranty is one of ordinary care and skill.

*Cantrell v. Woodhill Enterprises, Inc., supra,* 160 S.E.2d 476.

4. Since it has been determined that Atchison & Keller was not in breach of its subcontract with CITCON, the Court need not address the defendants' contentions that the release of Peerless under the bond released Atchison & Keller as well. Nor need the Court determine the validity and scope of CITCON's assignment to Reminc.